Steven Anthony SERA *v.* STATE of Arkansas

CR 98-1222 17 S.W.3d 61

Supreme Court of Arkansas
Opinion delivered May 25, 2000

418

*Sam Pope*, Judge;

*John Wesley Hall, Jr.*, for appellant.

*Mark Pryor*, Att'y Gen., by: *Sandy Moll*, Ass't Att'y Gen., for appellee.

LAVENSKI R. SMITH, Justice. Appellant, Steven Anthony Sera appeals his conviction on eight criminal counts related to three sexual encounters involving the use of the drug Rohypnol with two women in Monticello, Arkansas. Sera raises five points on appeal, including challenges to the sufficiency of the evidence, the trial court's admission of evidence under Ark. R. Evid. 404(b), the constitutionality of the Arkansas Rape Shield Statute, the admission

of certain expert testimony, and the admission of a videotape depicting three sexual encounters involving Sera and three different apparently unconscious women, including one of the victims. The court of appeals certified this case to us because the constitutionality of the rape-shield statute is at issue. We affirm.

*Facts*

The facts in this case are extensive. The trial record contains nearly 3100 pages of pleadings, testimony and exhibits. A thorough factual summary is required because a challenge has been made to the sufficiency of the evidence. In late summer of 1996, Sera lived with his wife and daughter in Dallas, Texas. There, Sera owned and operated Chandler Lumber Company, named after his daughter. After hearing of the closing of a lumber mill in Warren, Arkansas, Sera began visiting Warren to explore purchasing the property. Sera eventually bought the property and started a mill division of his company in Warren.

The first five counts of the criminal information filed against Sera involve Tammy Deal. Toward the end of August or early September, during one of Sera's visits to Warren to set up the mill, he and a friend went out one night to a local Warren bar called Spanky's. While there, Sera met Deal, and the two spoke for several minutes. The next day Sera sent flowers to Deal. Deal testified that Sera's gift surprised her. She stated that Sera began calling her at work to ask her out. Initially, she did not accept the invitations, but eventually agreed to date, believing that he was divorced. Soon Sera began buying her clothes and jewelry, including lingerie from Victoria's Secret. On one occasion, he sent her flowers with a card attached which read, "Every woman needs to know that someone finds them interesting, intelligent and attractive." On another occasion, he sent her a flower arrangement with a card that read, "I'm leaning more towards one of the best things that ever happened. All my love, Steven."

When Sera was in Warren on business, he usually resided at one of two bed-and-breakfasts, the Burnett House or the Colvin House. Sera testified that he and Deal mainly spent their time together at the bed-and-breakfasts, often just sitting on the porch and talking. Deal testified that they spent very little time together

before the first of the two episodes charged in this case. Deal testified that the two did not start a sexual relationship until after her birthday which was just before Thanksgiving. She indicated their consensual encounter took place at the Burnett House. Sera testified that during the course of their relationship he and Deal were intimate on several occasions.

Deal testified that the first occasion she spent any significant time alone with Sera occurred one afternoon in October when her cousin, Teresa Waters, offered to watch Deal's two sons. Deal told Sera about this, and Sera offered to take Deal to Monticello for the afternoon. Throughout the trial, the facts surrounding this trip are referred to as the "Monticello incident." Deal agreed and dropped her children off at her cousin's house. Deal testified that Sera placed a six-pack of beer in a cooler in the trunk of his car. During the trip to Monticello, Sera pulled off the road and asked Deal if she wanted a beer. She agreed, and he stepped to the back of the car to get the drink. Deal testified that he remained at the rear of the car for quite some time which prompted her to ask what was taking him so long. He responded that he was mixing a drink for himself. When he returned, he handed Deal the beer, and they continued driving. The couple pulled over again after Deal finished the first beer, and Sera got her another one. Deal testified that from that point she did not remember much of the remainder of the trip back from Monticello. Sera later told her she consumed two or three more of the beers on the way back. Deal has no memory of this or most of the events of the afternoon. According to Deal, the next thing she clearly remembered was going to her cousin's house to pick up her children.

The couple next went on a trip together to a casino in Greenville, Mississippi. Deal testified that they both consumed alcohol, and that she did not remember much about the ride back to Warren. Her next memory was waking up on the couch in the living room the next morning at the Burnett house. Again, Deal testified that Sera insinuated that she had had too much to drink the day before.

The couple's third out-of-town trip involved a trip from Warren to Little Rock for dinner at the Macaroni Grill restaurant. According to Deal, Sera bought two individual cans of beer on the way to Little Rock, and that she drank one of them, and took a few

drinks from the other. During dinner, Deal recalls drinking a glass of wine and a glass of water. Towards the end of dinner, Deal left the table to go to the bathroom. According to Deal's testimony, she returned to the table and finished her water, and soon thereafter began to feel ill. Her last recollection of the evening was walking to the car in the restaurant parking lot. She testified that she did not recall any of the 100-mile trip home to Warren, and that the next time she was aware, she was waking up in bed with Sera the next morning at the Burnett House. She continued to feel sick for the rest of the day and evening, with stomach cramps and nausea. During trial, the parties referred to this third trip as the "Macaroni Grill incident."

According to Deal, the couple's one and only consensual intimate encounter occurred in November around the time of her birthday. Sera had given Deal several birthday presents, including a pearl necklace and earrings, and the couple met at the Burnett House before Sera went out of town on a business trip. Deal testified that Sera did not videotape their tryst and that she was conscious throughout. She further recalled that she returned to the Burnett House to see Sera the next evening on his invitation, but that he was not there.

Deal concluded her testimony by relating to the jury an account of her last contact with Sera. In early December, she went to the Burnett House to return some of the presents Sera had given her. Deal recounted that when she approached the Burnett House, she observed Sera holding an unconscious woman in his arms while trying to unlock the door. Deal recognized this woman as Jackie Haygood. Haygood is the other victim in this case. According to Deal's testimony, she greeted Sera, who acted "startled" and "nervous." Deal spoke, saying, "I see you have your hands full." Sera responded that he would call her the next morning, and then she left.

At the time, Deal assumed Haygood must have been drunk and had passed out. The events Deal witnessed on the steps of the Burnett House that night underlie the three remaining counts of the eight counts charged against Sera. These counts involve the attempted rape, kidnapping, and introduction of a controlled substance into Haygood by Sera.

At trial, Haygood testified to the events leading up to what Deal witnessed on the Burnett house steps. Sera's contacts with Haygood coincided with his business trips to Warren during the second half of 1996. Sera became friends with Haygood through his acquaintance with her husband, Gary. Gary was an employee of Sera's company, and Haygood assisted the company to get its mill offices established. According to both Sera and Haygood, Sera understandably spent considerable time with Haygood and her husband, because they worked together. Sera testified that he considered Haygood a very close friend and even called her "Little Sis." Haygood also testified that she thought of Sera as a good friend.

According to Haygood, on December 12, 1996, Sera arranged for Haygood's husband to be out of town overnight on a business trip to some out-of-state mills. That evening, Sera and Haygood drove to Little Rock to buy supplies for the office, a trip which had been planned for several days. Sera and Haygood stopped in Pine Bluff on the way to Little Rock to buy some alcohol. Sera purchased a small bottle of tequila and eight premixed margaritas. Sera put the drinks in an ice chest in the back of his Range Rover. Haygood testified that she drank one of the premixed margaritas out of the bottle, and the two split some of the others. By Haygood's count, she drank one, poured one out in Little Rock, Sera poured one out, and three-and-a-half were left the next day.

After they returned to Warren from Little Rock and unloaded some of the supplies in the truck, Haygood called her husband from the mill at approximately 9:25 to 9:30 p.m. to let him know that she was home from her trip. Haygood testified that when she walked out of the mill office, Sera had lowered the tailgate to the truck, and was holding two plastic cups with tequila in them. Sera handed Haygood one of them. Sera admitted that he had put one or two Rohypnol tablets and a Vicodin-EX analgesic in one of the cups. He testified that he prepared that particular drink for himself. However, it is undisputed that he gave the drink containing the narcotics to Haygood who drank it. Immediately, she noticed a gritty substance in the bottom of the cup. According to Haygood, she promptly asked Sera what he had put in her cup. He denied that anything was in the cup. According to his testimony, he initially denied putting anything in her cup, but knew that he was going to have to explain things to the Haygoods and his business partner.

According to Haygood's testimony, she soon felt the effects of the drugs, and could not remember going home that evening. A short time later, Tammy Deal observed an unconscious Haygood in Sera's arms at the Burnett house as mentioned above.

Sera testified that once he realized what had happened, he decided he needed to take her home. He denied taking her to the bed-and-breakfast where he was staying on that trip, and contended that Deal lied when she testified that she saw Sera holding Haygood and trying to open the door that night at the Burnett House. According to Sera's testimony, he drove Haygood home and took her into her house. There, he met the Haygood's son, Chad, who helped Sera put Haygood into bed. Chad acknowledges greeting Sera and helping his unconscious mother to bed. Chad recalled Sera telling him that Haygood had had too much to drink that night. Chad also testified that Sera brought Haygood into the house at approximately 9:45 or 10 p.m. When Sera returned to his car, he called Haygood's husband and told him that he had taken Haygood home and put her to bed because she was drunk. However, he did not tell Haygood or her husband that had allowed her to unknowingly ingest narcotics.

Haygood's next memory was waking up in her bed the next morning and feeling very sick and very uncoordinated. She could not remember how she got there. Haygood testified that she called Sera and again asked what he had given her. Again, he blamed her condition on over drinking, which she denied. Haygood actually rode with Sera to work that day, but testified that she felt bad the whole day. That evening, knowing something had happened, Haygood saw her doctor who took a urine sample to be sent to a lab and tested. The test later returned showing a positive indication of Rohypnol in Haygood's urine.

Haygood and Sera had several contacts over the following days. The Haygoods informed Sera as well as Sera's business partner about the drug-screening results. After learning of this, Sera fired Haygood, but later apologized for doing so. According to Haygood, Sera called her house repeatedly begging her not to pursue the matter because he would "lose everything" if she did. Ultimately, Sera sold the company to his partner to be relieved of the situation.

As these events unfolded in Arkansas, others transpired in Texas. Another female witness, Melanie Hataway, testified extensively about her contacts with Sera. Hataway is the third of the three victims depicted on the videotape introduced by the State. According to Hataway, she met Sera on November 8, 1996, at a restaurant in Dallas. Hataway testified that Sera approached her in the restaurant and began talking to her. The two then carried on a conversation for most of the evening. Hataway testified that she asked him if he had a girlfriend. He replied that he did in California, but that after meeting Hataway, he knew that his girlfriend would not be happy because he felt that Hataway was "someone special." According to Hataway, Sera insisted that she join his group for dinner, and then, when she began to order, told her to order the most expensive item on the menu. Ultimately, the couple did not stay for dinner, but went to another restaurant where they had several drinks and danced. Hataway then went home.

The following Monday, Sera sent Hataway a large bouquet of flowers and began calling her at work. On Wednesday of that week, Sera sent a box to Hataway's office containing presents of clothing and lingerie. The box had a note attached to it which read, "Melanie, every woman needs to know that someone finds them intelligent, interesting, and extremely attractive. Always, Steven." Hataway testified that Sera represented that he broke off the relationship with his girlfriend in California because he felt strongly about his relationship with Hataway.

Although they spoke on the phone almost daily, Hataway did not see Sera again until she agreed to go to New Orleans on an overnight trip on November 22, 1996. Sera rented two hotel rooms, and the couple flew down together. Upon arriving at the hotel, Hataway changed clothes in her room, and when she was finished, Sera presented her with a pearl necklace. Hataway admits that she had consensual sex with Sera that night, but denies that the encounter was videotaped. The couple returned to Dallas on Saturday, and Hataway drove Sera to his house, where Sera's wife, Nancy, met him at the door. According to Hataway, Sera led her to believe that Nancy was really his ex-wife and that she only stayed in Dallas when she was passing through to pick up or drop off Chandler. At that time, Nancy was seven months pregnant with the Sera's second child.

The following Monday, Sera sent Hataway the shirt he had been wearing on Saturday, sprayed with the cologne he wore. Attached was a note which read, "Melanie, something to sleep in while I'm gone. All my love, Steven." When Hataway went home to New York for Thanksgiving, Sera sent presents for her family. He also sent her a copy of a children's book, which Sera called his daughter's favorite. Another present in that package was a set of pearl earrings. The couple continued to speak frequently and at length on the telephone.

On December 2, 1996, Hataway went to Sera's house for dinner, and met Sera's brother, Tony. Again, Sera gave Hataway another children's book, and then showed her most of the house. On this occasion, Hataway acknowledges having consensual sex with Sera in Sera's house but denies any consent to it being videotaped.

On December 4, 1996, Hataway planned to attend a charity event with friends, and Sera invited himself to go along. At the event, Sera fixed Hataway's drinks in a "special glass" from a special bottle of champagne behind the bar. The couple ultimately got into an argument because, according to Hataway, Sera was becoming too friendly with some of her female friends. The two left the restaurant and got into Sera's car and, according to Hataway, that was the last thing she remembered until she woke up in bed naked, feeling sick with stomach cramps. Hataway testified that she drove herself to the hospital at approximately 3 or 4 a.m., but fell asleep in the waiting room. She was awakened by a nurse who told her to either check in or go home, so Hataway went home. Upon returning home, Hataway called Sera and questioned him about what had happened. Hataway testified that Sera asked her if she was breathing alright, which she said she was, and then he came over. Ultimately, Sera implied Hataway had had too much to drink.

Hataway testified that she and Sera saw each other a couple of times after that, but that after the week of December 6, 1996, he just "disappeared." Hataway testified that she did not hear from him again until January 5, 1997. Over the following weeks they met a few times for dinner and to go to a Dallas Mavericks basketball game on January 17, 1997. Hataway testified that she drank one glass of wine at the game, and started another glass, but began to feel bad. She testified that she remembered leaving the game, but

that her next memory is waking up the next morning, and seeing Sera walk into her bedroom. Hataway testified that she asked him what happened, and that he told her again that she had had too much to drink. She disputed this, noting that she only had two glasses of wine. He left soon after. Hataway did not see Sera again.

All of these apparently isolated events eventually became related and took on a more sinister light after Sera's wife, Nancy, filed for divorce in Texas. She did so after learning of Sera's affair with Melanie Hataway. According to Hataway, she received a message from Nancy Sera on January 18, 1997, in which Nancy explained that Sera and Nancy were married and that Nancy was over seven months pregnant. Nancy requested that Hataway call her. Hataway did not call Nancy, and attempted to avoid Sera's calls for several days. Finally, she spoke to Sera on January 24, 1997, and told him that she did not want to see him anymore. Hataway testified that Sera, at first, acted confused and stated that he thought they had a good relationship. Hataway then told Sera that she knew Nancy was still married to him and that she was pregnant. According to Hataway, Sera called Nancy a "lying bitch" and claimed that they had not been intimate for over a year and that the child was not his. After this conversation, Sera showed up at Hataway's apartment several times, but Hataway refused to answer the door.

Nancy testified that until mid-1996, she believed she and Sera had a strong marriage, and she became pregnant with the couple's second child in July, 1996. She testified that Sera was "thrilled" with the news. But, by early 1997 she suspected Sera was having an affair, and confirmed this during the Hataway incident. According to Nancy, in December 1996, a man came to the door, and Sera pretended to be his own brother, Tony, when he spoke to the man. She identified the person at the door as Fred Daugherty. Daugherty later became the private investigator for Nancy's divorce attorney. According to Nancy, she found the videotape sometime in mid-June 1997 after she and Sera had separated. Sera's testimony contradicted her and he contended that Nancy found the tape much earlier. Nancy explained that she had gone to their house (she was living in an apartment at the time) to get the video camera Sera had purchased to record an upcoming family event. Nancy still had a key and thus access to the home. After returning to her apartment, she checked the videotape in the camera and saw the videotaped incidents of Sera with three women including her own younger

sister, Patty Coleman. Nancy called her divorce attorney who told her to give the tape to Daugherty who in turn gave it to the police after having copies made.

Nancy also testified that once when she cleaned out Sera's suitcase after a trip, she found a bottle labeled "Rohypnol," and she hid the bottle with several pills in it. When Sera looked for his pills, he became very upset when he could not find them, according to Nancy. Nancy eventually gave this bottle to Daugherty in the course of his investigation. Daugherty had it copied onto some VHS tapes at a video store where he took many of his work projects.

When Nancy confronted Sera about the tape and told him that she had taken it to the police, he told her that if she didn't get the tape back, he would go to jail. He then took their daughter Chandler and left town for several days. Nancy and Daugherty returned to the house some time later, and Daugherty searched the house and took packets of medicine from Sera's shaving kit.

The Colleyville, Texas, police department reviewed the tape. They contacted Hataway who came down and viewed the tape. After witnessing it, she became physically sick according to the testimony of an Officer Badillo of the Colleyville police. The Texas authorities contacted their Arkansas counterparts when they suspected an Arkansas resident might be included on the tape. They were correct. Tammy Deal was eventually identified as one of the women appearing on the tape. She, too, expressed disgust and shock upon being informed of her appearance on the videotape.

On July 14, 1997, the Bradley County prosecutor filed original charges against Sera consisting of six counts arising out of incidents with Haygood and Deal, the two Arkansas victims. Several pretrial motions were filed by the State and the defense. In particular, Sera filed motions to declare the rape-shield statute unconstitutional and to exclude the testimony and evidence from Hataway and Coleman. The State amended the felony information on December 15, 1997, to then state eight counts. A brief summary of those counts follows:

*Counts one and two*:

 1. Administering or causing to be ingested, inhaled or otherwise introduced into Tammy Deal a Schedule IV controlled substance, Rohypnol — Class C felony;

 2. Engaging in sexual intercourse or deviate sexual activity with Tammy Deal when she was incapable of consent due to the drugs without her knowledge or consent — Class Y felony.

*Counts three, four, and five:*

 3. Administering or causing to be ingested, inhaled or otherwise introduced into Tammy Deal a Schedule IV controlled substance, Rohypnol — Class C felony;

 4. Restraint of Tammy Deal without consent for the purposes of engaging in sexual intercourse, deviate sexual activity or sexual contact with her — Class B felony;

 5. Engaging in sexual intercourse or deviate sexual activity with Tammy Deal when she was incapable of consent due to the drugs without her knowledge or consent — Class Y felony.

*Counts six, seven, and eight:*

 6. Administering or causing to be ingested, inhaled or otherwise introduced into Jackie Haygood a Schedule IV controlled substance, Rohypnol — Class C felony;

 7. Restraint of Jackie Haygood without consent for the purposes of engaging in sexual intercourse, deviate sexual activity or sexual contact with her — Class B felony;

 8. Engaging in conduct intended to culminate in the commission of the offense of rape upon Jackie Haygood — Class Y felony.

The trial court held a pretrial hearing to determine if the testimony of Hataway and Coleman should be excluded. After the hearing, the trial court denied the defense's motion to exclude the evidence in an order on December 19, 1997. The trial court later held another hearing to determine the constitutionality of the rape-shield statute and the admission of certain evidence under that statute on February 17, 1998. In due course, the trial court denied Sera's motions.

The jury trial began on March 10, 1998, and continued six days. During the trial, the State presented numerous witnesses,

including Haygood and her son Chad, Nancy Sera, Daugherty, Deal, Waters, Coleman, Officer Badillo, and Hataway. Other relevant State witnesses included two experts, Dr. Mahmoud ElSohly and Dr. James Tolliver, who testified regarding the history and effects of Rohypnol.

According to Coleman's testimony at trial, the episode on the tape involving her must have occurred one night when Sera visited Coleman in Springfield, Missouri, where Coleman was in college. According to Coleman, Sera called her at school and told her that he was coming through Springfield and that he wanted to take Coleman and some of her friends out for the evening in a limousine. He also told Coleman that he wanted her to go shopping for a new outfit and new pajamas for the evening, and to get her hair done. He was going to rent two rooms at a hotel for them to stay in, and that Coleman could have a friend stay with her in her room. According to Coleman, Sera told her not to tell her parents that he was passing through Springfield.

The evening began with Sera, Coleman, and a group of her friends riding in the limousine to Branson, Missouri, where the group had dinner. Coleman recalls that they drank some alcohol on the way down to Branson, and that Sera mixed her drinks. Coleman remembers having two or three drinks on the way to Branson. On the way back to Springfield after dinner, Coleman only recalls one drink, and then falling asleep in the limo. Her next memory was waking up in Sera's hotel room wearing one of his t-shirts. Coleman testified that she felt very tired. Sera told her that she drank too much. Coleman testified that when she left the hotel with Sera to go back to her dormitory, she saw a tripod in the back seat of his car, and remembered seeing a camera or a red dot. Coleman testified that at no time did she agree to have intercourse with Sera or agree to be videotaped.

In response to Coleman's assertions, Sera testified that he and Coleman had an ongoing sexual relationship which included contact in Missouri and in Texas when Coleman came to visit. Sera testified to several encounters with Coleman, and testified that they, too, had videotaped these episodes. Sera also testified that the two had taken still photographs of one another, and the Nancy had found these photos and burned them in the fireplace. Sera stated that Nancy was aware of his relationship with her sister. Sera testi-

fied that on the night that he took Coleman and her friends to dinner in Branson, Coleman drank several drinks on the way to and from Branson. He testified that she passed out from the alcohol, and he helped her to bed.

Dr. ElSohly, a pharmacologist who created a test for Hoffman-LaRoche, the manufacturer of Rohypnol, to detect the presence of Rohypnol in human test samples, testified regarding the pharmacological effects of the drug. Dr. ElSohly testified that Rohypnol is in the class of drugs called benzodiazepines, a class which includes Valium, and that the effects of the drug on the human body can include hypnosis, or sleep, total muscle relaxation, and loss of memory. Dr. ElSohly also described the test he developed to detect the presence of Rohypnol metabolites in urine samples to determine if and when someone had ingested the drug. It was this test that Dr. ElSohly's private lab conducted on Haygood's urine sample sent to them by Dr. Pennington, Haygood's physician in Warren.

Regarding that test, Dr. ElSohly testified that a person in his lab conducted the test and found the presence of the metabolites, and that he reviewed the test results and signed off on them before returning the results to Dr. Pennington. Finally, Dr. ElSohly testified that after reviewing the videotape of the episodes involving Coleman, Deal, and Hataway, he believed that it was possible that these women were under the influence of Rohypnol, but could not rule out different drugs, as well.

Dr. Tolliver, a pharmacologist with the Drug Enforcement Agency, testified extensively regarding his familiarity with Rohypnol and his studies and research projects on the drug. Dr. Tolliver testified that Rohypnol is not legal in the United States, but that it is sold outside of the country in countries such as Mexico. Dr. Tolliver testified that as part of his job with the DEA, he has studied the uses of the drug in medical fields, as well as how the drug was being misused in the United States. Dr. Tolliver noted the he has participated in several workshops in Virginia regarding the use of Rohypnol in sexual-assault cases, and he testified regarding his experience and knowledge about the five main effects of the drug on the human body. He, too, indicated that Rohypnol will cause hypnosis, relieve anxiety, have an anti-convulsive effect, relax skeletal and smooth muscles, and cause anterograde amnesia, which is the failure to remember things that happen while under the

influence of the drug. Dr. Tolliver testified that depending on the amount of the drug taken and at what point the drug is taking effect, a person can be talking and functioning and still not be able to remember what happened during that time. Because Rohypnol is a depressant, its effects can be as far-reaching as causing death when too large a dose is ingested. This is caused by the depression of the respiratory system, making it difficult or impossible to breathe. Furthermore, Dr. Tolliver stated that combining Rohypnol with another drug such as alcohol causes a magnification of the effects of the drug. This can cause a deeper state of unconsciousness, it would require a greater amount of stimulus to awaken the person affected by the drug. He pointed out that the onset of the reaction to the drug can take anywhere from fifteen to thirty minutes, depending on whether the drug is taken in tablet form or whether it is ground up into a powder-like substance. In addition, Dr. Tolliver stated that his studies on the drug included dissolving it into several types of alcoholic drinks, and he noted that the drug would "fizz" in carbonated drinks until dissolved while it would not in uncarbonated drinks. Dr. Tolliver testified that one of the side effects of the drug was gastrointestinal problems and cramping, and that this effect could be increased when the drug is combined with alcohol or other drugs. Finally, Dr. Tolliver, after viewing the videotape, opined that he believed that the victims' behavior was consistent with the effects of Rohypnol. He did not believe that alcohol, in the amounts taken as indicated by the victims, would produce the effects he saw on the videotape.

At the close of the State's case, Sera moved for directed verdict as to count one, count three, and count five. Sera contended there was no evidence on count one or count three that Sera introduced a drug into Deal. Also, he argued that count five should be dismissed because there was no evidence that deviate sexual activity took place. The State responded arguing that the expert testimony showed the victim's behavior was consistent with Rohypnol ingestion and that she regained consciousness in the defendant's bed dressed only in a t-shirt. The State also pointed to evidence from other witnesses which indicated a pattern and plan by Sera. The court denied Sera's motion.

The defense presented testimony from seventeen witnesses in its case. Sera testified on his own account. His brother, Tony, testified regarding his impressions about Sera's relationships with

Nancy, Hataway, and Coleman. Tony testified that he knew of Sera's affair with Hataway, but he noted that he did not tell Nancy about it. Tony also testified that he was aware that Coleman had a "romantic" relationship with Sera. Again, however, he did not tell Nancy about this alleged affair. He testified that he saw the purported nude photographs of Coleman and Sera.

Sera's defense also included the testimony of Mike Narisi, a video and production expert, who testified regarding the videotape. According to Narisi, the original 8mm videotape was the tape used to record the three sexual encounters, but that the tape was edited somehow between the second and third episodes. Narisi testified that the episodes themselves had not been edited, and that the break between the first and second episodes was the natural break caused by the video camera. However, the edit between the second and third episodes was completed by some other type of editing machine, such as a VCR or professional editing equipment, and that it was impossible to tell whether this edit was completed by Sera, who would have had the capability to do the edit, or some other person. Narisi testified that it would be impossible to determine what was edited out of the tape.

At the close of the defense's case, Sera renewed his directed-verdict motion. In addition to the three counts raised earlier, he attempted to add counts two (rape) and four (kidnapping) to the motion neither of which were raised in the prior motion. The trial court again denied the motion, and the case went to the jury. The jury convicted Sera on all eight counts, and sentenced him to a term of years on each respective count totaling eighty-five years. The jury recommended the sentences run concurrently. The longest single sentence was thirty years for rape. Count five involving Deal in the "Macaroni Grill" incident was the only rape conviction. Sera appealed his conviction on March 30, 1998, in a timely manner.

Sera raises five points on appeal. The first point is a challenge to the sufficiency of the evidence on counts three, four, and five involving one of two prosecuted incidents involving Tammy Deal. Sera's second point alleges that the trial court erred in admitting Rule 404(b) evidence, including evidence of two separate incidents involving two other victims from Missouri and Texas. Sera contends that the evidence should not have been admitted because it was

used by the jury to prove Sera's guilt, not just to show a pattern of behavior. Sera's third point challenges the constitutionality of the Rape Shield Statute, codified at Ark. Code Ann. § 16-43-101. He contends that the statute was improperly adopted or is unconstitutional or, in the alternative, that the trial court misapplied it to exclude evidence pertaining to one of the victims, Jackie Haygood. In his fourth point, Sera argues that the trial court erred in allowing one of the State's experts to testify regarding the effects of Rohypnol on people and regarding the results of the urine test on Haygood. Finally, Sera argues that the trial court erred in admitting the videotape because of tampering.

*Standard of Review*

 A directed-verdict motion is a challenge to the sufficiency of the evidence. *McDole v. State*, 339 Ark. 391, 6 S.W.3d 74 (1999); *Ayers v. State*, 334 Ark. 258, 975 S.W.2d 88 (1998). We consider sufficiency of the evidence before addressing other alleged trial errors. The test for determining sufficiency of the evidence is whether there is substantial evidence to support the verdict. On appeal, we will review the evidence in the light most favorable to the appellee and sustain the conviction if there is any substantial evidence to support the verdict. Evidence is substantial if it is of sufficient force and character to compel reasonable minds to reach a conclusion and pass beyond suspicion and conjecture. Only evidence supporting the verdict will be considered. It is important to note that the court will make no distinction between circumstantial and direct evidence when reviewing for sufficiency of the evidence. However, for circumstantial evidence to be sufficient, it must exclude every other reasonable hypothesis consistent with innocence. Whether the evidence excludes every hypothesis is left to the jury to determine. *Williams v. State*, 338 Ark. 97, 991 S.W.2d 565 (1999). Guilt may be proved in the absence of eyewitness testimony, and evidence of guilt is not less because it is circumstantial. *Trimble v. State*, 316 Ark. 161, 871 S.W.2d 562 (1994).

 The admission or rejection of evidence under Rule 404(b) is committed to the sound discretion of the trial court, and we will not reverse absent a showing of manifest abuse. *McGehee v. State*, 338 Ark. 152, 992 S.W.2d 110 (1999); *Echols v. State*, 326 Ark. 917, 936 S.W.2d 509 (1996), *cert. denied*, 520 U.S. 1244 (1997). Corre-

spondingly, the trial court has the discretion to determine whether prejudicial evidence substantially outweighs its probative value, and its judgment will be upheld absent a manifest abuse of discretion. *Parker v. State*, 333 Ark. 137, 968 S.W.2d 592 (1998).

■ Our State's statutes are presumed constitutional, and the burden of proving otherwise is placed on the party challenging the legislative enactment. *ACW, Inc. v. Weiss*, 329 Ark. 302, 947 S.W.2d 770 (1997); *McCutchen v. Huckabee*, 328 Ark. 202, 943 S.W.2d 225 (1997). We resolve all doubts in favor of a statute's constitutionality. *Golden v. Westark Community College*, 333 Ark. 41, 47, 969 S.W.2d 154 (1998).

■ A ruling of admissibility under the rape-shield statute will not be overturned absent clear error or a manifest abuse of discretion. *Graydon v. State*, 329 Ark. 596, 953 S.W.2d 45 (1997). The admission of expert testimony under Ark. R. Evid. 702 is reviewed under an abuse-of-discretion standard. *MacKintrush v. State*, 334 Ark. 390, 978 S.W.2d 293 (1998). We will not reverse a trial court's ruling on a hearsay question unless the appellant can demonstrate an abuse of discretion. *Goff v. State*, 329 Ark. 513, 953 S.W.2d 38 (1997); *Bragg v. State*, 328 Ark. 613, 946 S.W.2d 654 (1997). We will not reverse the trial court's ruling on the admission of evidence absent an abuse of discretion. *Edwards v. Stills*, 335 Ark. 470, 984 S.W.2d 366 (1998); *Smith v. Galaz*, 330 Ark. 222, 953 S.W.2d 576 (1997); *Warhurst v. White*, 310 Ark. 546, 838 S.W.2d 350 (1992).

## I. Sufficiency of the Evidence

In his first point, Sera argues that as to counts three, four, and five, all involving the "Macaroni Grill" incident with Deal, that the jury had insufficient evidence on which to convict him of introduction of a controlled substance into Deal (count three), kidnapping Deal (count four), and rape (count five). Sera first attempts to clarify for which counts he sought directed verdicts. He avers that his directed-verdict motion dealt exclusively with the "Macaroni Grill" incident and that the clear purpose of the motion was to challenge the evidence for allegations which did not appear on videotape and for which he was convicted of rape. Regarding the "Macaroni Grill" incident, Sera argues that the evidence is purely

speculative in that there were no witnesses, and Deal herself could not say whether she had engaged in intercourse that night. Sera argues that since the evidence showed Deal had been drinking it was more likely that she had too much alcohol to drink than that she had been drugged. Sera points out that Deal's testimony acknowledged that in this incident, as well as the "Monticello" incident and the trip to the casino in Greenville, Mississippi, that she had been drinking. Sera argues that Deal testified that she maybe had drunk too much on the trip to Greenville when she had a lapse in memory, but that Sera has not been charged with that incident. Sera contends that the only evidence regarding the "Macaroni Grill" incident includes Deal's testimony that she vaguely remembers feeling sick at the restaurant after dinner, going to the car from the restaurant, and waking up in the Burnett House wearing a long t-shirt of Sera's and feeling sick to her stomach. Sera maintains that the only "evidence" used to support these convictions stems from the Rule 404(b) evidence admitted regarding Sera's pattern and plan with other alleged victims, but that this type of evidence cannot be used to prove guilt.

 The State counters by first arguing that Sera did not make a sufficient directed-verdict motion at the close of the State's and of the defense's cases to preserve this argument for appeal. Specifically, the State notes that while Sera argues on appeal that the challenge in the directed-verdict motion was on counts three, four, and five, that the actual challenge at trial was on counts one, two, and five, involving the "Monticello" incident charges. The State also notes that at the close of all of the evidence, Sera's renewed directed-verdict motion sought to "add" for exclusion the drugging counts and the kidnapping counts as to Deal. As such, the State argues that Sera did not preserve the challenge to the sufficiency of the evidence on these counts because he failed to properly raise them in his motion for directed verdict. With respect to Sera's directed-verdict motion as to count four (kidnapping), we agree with the State that he has failed to preserve it for appellate review. Sera did not raise count four in his initial directed-verdict motion; in order to preserve sufficiency of evidence as an issue for appellate review, it must be raised at the close of the State's case and renewed at the close of all the evidence. *King v. State*, 338 Ark. 591, 999 S.W.2d 183 (1999); *See also,* Ark. R. Crim. P. 33.1. Appellant failed to do this with regard to the kidnapping charge. Therefore,

the sufficiency challenge was not preserved. However, we hold as to counts three and five that Sera did preserve challenges to the rape and introduction of a controlled substance in conjunction with the "Macaroni Grill incident."

On the merits of the sufficiency argument, the State argues that sufficient evidence does exists to affirm the jury's convictions. The State details three episodes involving Deal, including the "Monticello" incident, which was depicted on the videotape, the Greenville trip, and the "Macaroni Grill" incident, which is the subject of this sufficiency challenge. The State notes that Deal testified that in each incident, she was given a drink or several drinks mixed by the defendant and that in each incident she had lapses in memory and felt sick. Regarding the "Macaroni Grill" incident, Deal testified that she only drank approximately one-and-a-half beers and a glass of wine at dinner, but began to feel sick afterwards. She testified that she had a lapse in memory immediately after leaving the restaurant and woke up the next morning in a bedroom at the Burnett House, dressed in a long t-shirt. Deal testified that she felt sick, and remained sick for the rest of the day. The State also details evidence of other encounters that Deal had with Sera, as well as evidence regarding Sera's encounters with other alleged victims. The State asserts that Sera admitted to having Rohypnol, and that he admits "accidentally" drugging Jackie Haygood, who experienced the same symptoms that Deal experienced during the "Macaroni Grill" incident. The State notes that Sera's explanation to each alleged victim was that they had consumed too much alcohol, despite the fact that in most instances, the victims testified that they had not had much to drink. The State notes that, based upon the expert testimony, Deal would not be able to remember the "Macaroni Grill" incident because Rohypnol prevents victims from recalling most or all events once the drug takes effect. The State argues that reversing the conviction based on Deal's inability to recall the events of that night would allow Sera to have "planned, executed and been held blameless for the 'perfect rape'." The State argues that Sera's statements about Deal were improbable statements explaining suspicious circumstances and, therefore, are admissible as proof of guilt, citing *Thomas v. State*, 312 Ark. 158, 847 S.W.2d 695 (1993). Furthermore, they are admissible as indicative of attempts to conceal a crime. *Brown v. State,* 311 Ark. 579, 847 S.W.2d 1 (1993). Finally, the State argues that the

jury could have been confused about which episode was depicted on the videotape, and that variances and discrepancies in the proof go to the weight and credibility of the evidence, and are matters for the fact finder to decide. In addition, the State argues that if this court determines that the evidence was not sufficient to support a rape conviction, the charge can be reduced to one of attempted rape.

 Regarding the sufficiency of the evidence on counts three and five, we hold the evidence to be sufficient. The evidence was not such that the jury was reduced to mere speculation and conjecture. It was not speculation for the jury to believe Deal's testimony that she had not had too much to drink. Nor was it conjecture for the jury to believe that Deal's lack of memory was due to a documented side effect of Rohypnol ingestion known as anterograde amnesia. As Dr. Tolliver, testified, "While you are actually under the effect of the drug, you may not remember some of the things you do or some of things that are done to you or what conversations you have or what is, what your experiences are." Dr. Tolliver further stated, "You can actually be functioning. You can be talking. You can be carrying on a conversation just like we are now and you may remember a little bit of it or you may, even may remember all of it or you may remember none of it or you may remember part of it." Regarding the "Macaroni Grill" incident, Dr. Tolliver stated that Deal's complaints of not being able to remember the trip home from the restaurant, and the stomach pains and cramping she experienced, would also be consistent with Rohypnol ingestion, especially when taken with alcohol. The sickness she felt was consistent with Deal's experience after the "Monticello" incident in which the videotape shows unequivocally that she was unconscious throughout most of the sexual encounter and, in fact, snored occasionally. The evidence showed that during the relevant time period Sera had access to the drug Rohypnol. Clearly, Sera had the opportunity, the scheme, or plan in place, and he had already carried it out on one prior occasion with Deal. The jury could reasonably conclude that Deal's surprise awakening the next morning in Sera's bed in a state of relative undress to be consistent with sexual activity of a nonconsensual nature.

 Sera offered to the jury a hypothesis consistent with his innocence, i.e., that Deal merely had too much drink, that no sex occurred, and that Deal was participating in a conspiracy against

him. However, the jury did not have to accept it as a reasonable hypothesis and apparently rejected it. We cannot say that they did so without substantial evidence. We havelong held that the trier of fact is free to believe all or part of a witness's testimony. *Stewart v. State*, 338 Ark. 608, 999 S.W.2d 684 (1999). The credibility of witnesses is an issue for the jury and not for this court. *Marta v. State*, 336 Ark. 67, 74, 983 S.W.2d 924, 928 (citing *Sanford v. State*, 331 Ark. 334, 962 S.W.2d 335 (1998); *Bell v. State*, 334 Ark. 285, 973 S.W.2d 806 (1998)). Further, the jury may resolve questions of conflicting testimony and inconsistent evidence and may choose to believe the State's account of the facts rather than the defendant's. *Bell, supra.*

## II. Arkansas Rule of Evidence 404(b)

In his second point on appeal, Sera argues that the trial court erred in admitting evidence under Ark. R. Evid. 404(b) because, while the court carefully analyzed the competing interests in making its Rule 404(b) determination, the admission of the evidence was more prejudicial than probative, resulting in a guilty verdict based on this evidence. Specifically, Sera notes that the trial court conducted a "lengthy 404(b) hearing" and issued a seven-and-one-half page order allowing in the videotape evidence and the testimony of Hataway and Coleman. However, Sera argues that the trial court erred in determining that this evidence was more probative than prejudicial under Ark. R. Evid. 403. Sera maintains that the fact that the jury convicted him of rape in the "Macaroni Grill" incident clearly shows that the jury used the Rule 404(b) evidence as proof of guilt. The State argues that the videotape and testimony of Hataway and Coleman were offered to show Sera's modus operandi, a legitimate and permissible reason for admission of the evidence under Rule 404(b). Because each episode with each victim was so similar, the evidence was highly probative and far outweighed any prejudice.

Two evidentiary rules come into play when considering whether prior acts of the defendant will be admitted: Rule 404(b) and Rule 403. First, Rule 404(b) controls when other crimes, wrongs, or acts may be admitted into evidence despite the general exclusion. Rule 404(b) states:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

We have previously recognized that this list of exceptions is not exclusive but instead represents examples of circumstances where other acts are admissible and relevant. *Lindsey v. State*, 319 Ark.132, 890 S.W.2d 584 (1994). Under Rule 403, evidence of prior crimes, wrongs, or acts, even if admissible under Rule 404(b), will not be admitted if the admission of such evidence is substantially outweighed by the danger of unfair prejudice. *Id.* In order to be admissible under Rule 404(b), the evidence must be "independently relevant to the main issue — relevant in the sense of tending to prove some material point rather than merely to prove that the defendant is a criminal — then evidence of that conduct may be admissible with a proper cautionary instruction by the court." *Lindsey, supra,* at 138. If the appellant did not ask for a cautionary instruction, he can claim no error on appeal. *Id.* In addition, the prior uncharged act to be admitted must have a "very high degree of similarity" with the charged crime. *Edwards, supra.*

When a trial court has admitted evidence under 404(b), we will not reverse absent a showing that the court manifestly abused its discretion. *McGehee, supra.* Sera acknowledges that the court thoroughly and thoughtfully considered the matter and determined that the evidence was both relevant and less prejudicial than probative. However, Sera considers the court to have abused its discretion. We disagree. In considering modus operandi, we do consider conduct in an unrelated incident against a third party. *See, e.g., Dillon, supra.; Frensley v. State*, 291 Ark. 268, 724 S.W.2d 165 (1987). The test used by this court is uniqueness of the methodology employed and striking similarity. *Id.* Indeed, in this case there was a striking similarity in Sera's conduct with respect to each of the women who testified. The evidence introduced through and about Coleman and Hattaway was highly relevant to prove Sera's modus operandi, scheme, or plan, from the initial courting of each of these women to the manner in which he ended each of the sexual episodes on the videotape with a similar degrading sex act. Each woman testified similarly to the way he flattered them, showered them with gifts, mixed their drinks, and his common explanation

for their lost memories. We cannot say the trial court abused its discretion in admitting this evidence.

## III. The Arkansas Rape Shield Statute

For his third point on appeal, Sera makes a two-part argument under Ark. Code Ann. § 16-42-101, also known as the Arkansas Rape Shield Statute. First, Sera argues that testimony he offered in which he alleged that he and Haygood had engaged in oral sex several weeks before she drank the Rohypnol-laced drink should not have been excluded because it was relevant under Ark. R. Evid. 401-403. Second, Sera argues that the statute was improperly adopted by the legislature or is unconstitutional under the separation of powers doctrine and his Sixth Amendment rights to produce witnesses, testify, and present a defense.

The State responds on this point by noting that this case illustrates precisely the prudence of a rape-shield statute. The legislature enacted it to prohibit a defendant from raising uncorroborated accounts of previous sexual encounters with the victim. The State argues that the alleged evidence of a prior sexual encounter was irrelevant where Haygood denied the encounter and Sera denies even attempting to have sex with Haygood in the episode at issue in the trial. Furthermore, regarding the legitimacy of the statute, the State argues that this court has the prerogative to adopt the rape shield statute as a rule, but that the court has also deferred to and acknowledged the legislature's responsibility for amending the statute and has even recognized appeals under the statute in the criminal procedure rules. Finally, this court has recognized that the right to present a defense is not without limitation, and that this statute is an authorized limitation in appropriate circumstances of that right.

■ The State is correct that the trial court's exclusion of evidence of the victim's prior sexual conduct was proper. Ark. Code Ann. § 16-42-101 regulates the type of evidence that can be admitted in a case involving sexual offenses. The statute defines "sexual conduct" as "deviate sexual activity, sexual contact, or sexual intercourse, as those terms are defined by § 5-14-101." Under § 5-14-101, these terms all involve some form of physical touching by a perpetrator against a victim. In criminal prosecutions

for sexual crimes, the rape-shield statute prohibits the introduction of

> opinion evidence, reputation evidence, or evidence of specific instances of the victim's prior sexual conduct with the defendant or any other person, evidence of a victim's prior allegations of sexual conduct with the defendant or any other person, which allegations the victim asserts to be true, or evidence offered by the defendant concerning prior allegations of sexual conduct by the victim with the defendant or any other person if the victim denies making the allegations is not admissible by the defendant, either through direct examination of any defense witness or through cross-examination of the victim or other prosecution witness, to attack the credibility of the victim, to prove consent or any other defense, or for any other purpose.

Ark. Code Ann. § 16-42-101(b). In order to introduce information that may fall under the statute, the defendant is required to file a motion in the trial court at least three days prior to trial, after which the court will hold a hearing to determine the relevancy and admissibility of the information. Ark. Code Ann. § 16-42-101 (c). Sera did so, but the trial court ruled that the only purpose in offering this evidence was to cast Haygood in a bad light. Such is the case here, in that the allegation of a prior oral sexual encounter between Sera and Haygood, which Haygood denies, has nothing to do with the episode prosecuted in this case. First, the allegation of the prior encounter is the very type contemplated to be excluded under the statute. Sera asserted at the pretrial hearing on admission of the evidence that introduction of the alleged encounter would show why he spent time with Haygood. However, Sera had already testified that he, along with Haygood's husband, and Haygood were working together to set up the lumber mill in Warren and thus spent considerable time together during the set-up of the mill. Second, Sera's defense to the episode prosecuted in counts six, seven, and eight was that he "mistakenly" drugged Haygood with Rohypnol meant for himself, and that he had no intention of committing any sexual act with Haygood. This explanation renders the introduction of any prior alleged sexual encounter with Haygood completely irrelevant. As such, the trial court properly rejected the admission of the evidence under the statute.

We also reject Sera's challenges to the constitutionality of the rape-shield statute. We have previously determined that the

rape-shield statute is constitutional and that it does not violate due process or equal protection rights. *See Kemp v. State*, 270 Ark. 835, 606 S.W.2d 573 (1980); *See also, Marion v. State*, 267 Ark. 345, 590 S.W.2d 288 (1979); *Dorn v. State*, 267 Ark. 365, 368, 590 S.W.2d 297 (1979). We do not view the statute as having supplanted this court's rulemaking power and ability to control the courts. Sera offers no authority that this court has shown any inclination to reject the rape-shield statute as a legislative intrusion into the court's province.

## IV. Expert Testimony

In his fourth argument, Sera argues that the trial court erred in allowing one of the State's experts, Dr. ElSohly, to testify as to the effects of Rohypnol on people, and as to Haygood's urine sample test results since he did not conduct the test. On the first point, Sera argues that the trial court should not have allowed Dr. ElSohly to testify regarding the effects of Rohypnol on people because, by his own admission, he had not studied the effects of Rohypnol on humans. On the second point, Sera argues that Dr. ElSohly should not have been able to testify regarding the results of Haygood's urine test because he, himself, did not perform the test and none of the "safeguards" were present, but instead he just read the report of the test which was performed by someone in his lab.

To the contrary, the State argues that the trial court did not abuse its discretion in allowing Dr. ElSohly to testify because he is a recognized expert in the field of pharmacology, the science of the effect of drugs on the human body. Moreover, he had studied the effects of the drug. Although he acknowledged that he had not viewed a person under the influence of the drug. He had, however, researched and read studies detailing the effects on people. Furthermore, the State argues that this court will allow an expert to testify regarding evidence made known to him before trial, and that case law also recognizes that an expert who supervised a technician performing a test could testify about the results after independent review of those results.

Ark. R. Evid. Rules 702 and 703 govern the admission of testimony of expert witnesses. Rule 702 states:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Rule 703 states:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

 Whether a witness qualifies as an expert in a particular field is a matter within the trial court's discretion, and we will not reverse such a decision absent an abuse of that discretion. *Smith v. State*, 330 Ark. 50, 953 S.W.2d 870 (1997); *Mace v. State*, 328 Ark. 536, 944 S.W.2d 830 (1997). If some reasonable basis exists demonstrating that the witness has knowledge of the subject beyond that of ordinary knowledge, the evidence is admissible as expert testimony. *Id.* The general test of admissibility of expert testimony is whether it will assist the trier of fact in understanding the evidence presented or determining a fact in issue. Ark. R. Evid. 702; *Matthews v. State*, 327 Ark. 70, 938 S.W.2d 545 (1997); *Stout v. State*, 320 Ark. 552, 898 S.W.2d 457 (1995). In addition, expert testimony must be relevant and not misleading or confusing to the jury. *Stewart v. State*, 316 Ark. 153, 870 S.W.2d 752 (1994). In determining the relevance of the testimony, the proponent must show that the evidence is reliable and sufficiently related to the facts of the case to aid the trier of fact in resolving the dispute. *Prater v. State*, 307 Ark. 180, 820 S.W.2d 429 (1991).

 We hold that Dr. ElSohly was properly qualified as an expert in the field of pharmacology, and specifically on the matter of the drug Rohypnol. In fact, as Dr. ElSohly testified, his private lab was hired by Hoffman-LaRoche, the drug manufacturer of Rohypnol, to develop testing procedures to detect the presence of the drug in humans. Dr. ElSohly's testimony detailed the physiological effects of the drug on humans. Dr. ElSohly's familiarity with the effects of the drug came from his testing and research. He noted that Rohypnol was found to actually induce hypnosis, total

muscle relaxation, total loss of sensation, and total loss of memory. He, like Dr. Tolliver, noted that the combination of Rohypnol and alcohol serves to magnify the effects of the drug. Furthermore, based on his knowledge of the physiological effect of the drug on the human body, he found that the testimony offered by the victims was consistent with the ingestion of the drug and the resulting disabilities produced by the drug. When asked if he had an opinion about whether the victims on the tape had ingested Rohypnol, Dr. Elsohly testified that while he couldn't specifically say that they had ingested Rohypnol in particular, he could say that their conditions were consistent with being under the influence of a drug that produces similar results to Rohypnol.

 As noted above, if some reasonable basis exists demonstrating that the witness has knowledge of the subject beyond that of ordinary knowledge, the evidence is admissible as expert testimony. *Mace, supra.* Here, it is clear that Dr. ElSohly has developed a far-reaching knowledge of the drug and its effects. The fact that he has never witnessed a person under the influence of the drug would go to the credibility of the evidence, not the admissibility. "Once an expert witness is qualified, the weakness in the factual underpinning of the expert's opinion may be developed upon cross-examination and such weakness goes to the weight and credibility of the expert's testimony." *Jackson v. Buchman,* 338 Ark. 467, 996 S.W.2d 30 (1999) (quoting *Suggs v. State,* 322 Ark. 40, 43, 907 S.W.2d 124, 126 (1995) (citing *Polk v. Ford Motor Co.,* 529 F.2d 259 (8th Cir.), *cert. denied,* 426 U.S. 907 (1976)).

Regarding Dr. ElSohly's testimony on the results of the urine test, the State points out that *Goff, supra,* is almost directly on point. In *Goff,* the defendant argued that the expert in that case should not have been allowed to testify regarding the results of a DNA blood test because the test had been performed by technicians under the supervision and control of a different supervisor who had prepared the DNA report. Goff argued that it was objectionable hearsay to allow the expert to testify concerning the test results and opinions in the report. In other words, the expert, using the supervisor's report, gave an opinion about the DNA results.

 In finding that the trial court did not abuse its discretion in allowing the expert's testimony into evidence at trial, we noted that the expert supervised the person who performed the test and

independently reviewed the test results. Under their office proto-col, the expert had to approve all results and conclusions that are reached at that lab. The court noted that under Ark. R. Evid. 703 an expert can render an opinion based on facts and data otherwise inadmissible, including hearsay, as long as they are of a type reason-ably relied upon by experts in the field. In addition, when an expert's testimony is based on hearsay, we have held that the lack of personal knowledge on the part of the expert does not mandate the exclusion of the testimony, but instead it presents a jury question as to the weight of the testimony. *Scott v. State*, 318 Ark. 747, 888 S.W.2d 628 (1994).

 Such was the case here as Dr. ElSohly independently reviewed the urine sample results and signed off on the test results. Furthermore, Dr. ElSohly developed the very testing procedures used to detect the metabolites indicating that Rohypnol is present in the sample. The trial court did not abuse its discretion in allowing Dr. Elsohly to testify about the test results. It was for the jury to weigh the credibility of the evidence based on the fact that he did not actually perform the test, but instead reviewed the testing procedures and signed off on the report.

## V. Admission of the Videotape

Sera's final issue on appeal is his contention that the trial court erred in admitting the videotape showing three episodes in which Sera engaged in intercourse and performed other sex acts with three women who are all indisputably unconscious. Sera argues that the evidence was uncontroverted that the tape had been edited and altered and, therefore, the tape was inadmissible as being unreliable. Sera asserts that the full videotape would have shown all three women being fully aware when the taping began, and only becom-ing unconscious during the middle of the taping of each episode. The State counters this argument by noting that Sera's testimony is in irreconcilable conflict with that of the victims depicted on the videotape who all testified that they were never aware that they were being taped and did not ever consent to being taped. The State further notes that Sera's own expert indicated that Sera was the original "editor" of the tape and, as such, the judge could conclude that Sera did all of the editing. Finally, the State argues that Sera did not dispute what was on the videotape, thus authenti-

cating the tape himself pursuant to Ark. R. Evid. 901(a). Any testimony concerning the alleged editing goes to the weight the jury should give the evidence.

Rule 1001 of the Arkansas Rules of Evidence includes "video tapes" in the definition of admissible items at trial. Rule 1002 requires the original to be produced, if available. This rule states:

> To prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules or by [rules adopted by the Supreme Court of this state or by] statute.

Rule 1003 details when duplicates may be admitted, and states:

> A duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity or continuing effectiveness of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original.

On appeal, we will not reverse a trial court's ruling on the admission of evidence absent an abuse of discretion nor will we reverse absent a showing of prejudice. *Huddleston v. State*, 339 Ark. 266, 5 S.W.3d 46 (1999); *Misskelley v. State*, 323 Ark. 449, 915 S.W.2d 702 (1996), *cert. denied*, 519 U.S. 898 (1996). The real dispute here arises from the testimony of Sera's witness who testified that it appeared that the videotape had been edited. The expert, Mike Narisi, testified on two occasions. He first testified before the State showed the video when the defense made an objection to the admissibility of the tape because of the alleged alterations. After the trial court ruled that the tape was admissible, Narisi testified during Sera's case, and again alleged that the tape had been edited. On both occasions, Narisi testified that he owned a video production company and had spent twenty-five years in the video and television industry. Narisi testified that he viewed both the original and a copy of the tape, and found only one instance of an "edit" which he believed was not performed using the video camera. He testified that the scenes themselves showed no editing, and that the break between the first and second episodes was accomplished by turning the video camera off and then back on. However, Narisi testified that the break between the second and third episodes was accomplished by a different piece of video equipment, perhaps a VCR or

more sophisticated piece of equipment, but that it was impossible to tell who made the edit or how it was done.

Based on this testimony, it appears that the expert only saw one point of dispute on the tape but was not able to give any definitive details regarding how that edit occurred. In fact, by his testimony, it appears that Sera was as likely as any other person to have performed the edit. Furthermore, the edited portion only relates to the break between the second and third episodes, but the episodes themselves, especially the first and second, were not altered according to the expert. Narisi testified that from the beginning of the first episode to the end of the second episode, any pauses or breaks were accomplished by using the video camera stop or pause functions.

Sera cites several cases for the proposition that this court has excluded film or videotape when the "conditions they claimed to represent were sufficient to make the file and videotape inadmissible." Sera cites *Utley v. Heckinger*, 235 Ark. 780, 362 S.W.2d 13 (1962) and *Carr v. Suzuki Motor Co.*, 280 Ark. 1, 655 S.W.2d 364 (1983), both of which dealt with the admissibility of evidence on film. In *Carr*, we reversed the trial court and excluded film evidence which contained a reenactment of a wreck prepared by one of the parties. We found that the film was prejudicial and misleading under Rule 403. The film in that case was not a film of the actual event, but a recreation. In *Utley*, we determined that a "day-in-the-life" film showing a victim of a car wreck walking with a cane should be excluded in part because the last few feet of the film showed the victim walking faster than she was actually moving. While the trial court gave an instruction to the jury to not consider the last section of the film, we determined without giving a reason that it was better not to show that part of the film at all. These cases are distinguishable from the instant case on the facts. In *Carr*, the film offered into evidence did not depict the actual events at all, but instead recreated inconsistently the original crash. In *Utley*, while the film was of the victim, the last few feet of film misrepresented her actual condition. Neither situation is present here. Instead, the videotape in this case depicts the actual events in each episode without any editing of the episodes themselves. By Sera's own testimony, these episodes depict the actual events which occurred on each occasion. Whether more occurred before or after these episodes would go to the credibility of the witnesses, as Sera testi-

fied that each woman was active before and after the videos were shot, and each woman testified that she had no idea that she was being filmed or that she had even had sexual relations with Sera on those occasions. The jury could make a reasonable judgment on the actions of the participants during the scenes contained in the videotape.

■ Sera further attempts to argue that this case is similar to *Crisco v. State*, 328 Ark. 388, 943 S.W.2d 582 (1997), in which we found that evidence admitted at trial on the type of drug found on the defendant was improperly admitted. In *Crisco*, we addressed a chain-of-custody dispute in that the drugs described by the seizing officer were very different from the drugs described as being tested by the lab. While this court determined that there was no significant break in the chain of custody, the descriptions of the seized and tested drugs was so substantially different as to render the evidence inadmissible. Here, however, the testimony regarding the evidence of possible editing of the tape still does not alter the fact that Sera verified the authenticity of the action taking place on the tape. We find no error in the admission of the videotape nor in any of the other points raised by Sera on appeal and accordingly, affirm.

Affirmed.

BROWN and IMBER, JJ., concurring in part and dissenting in part.

R OBERT L. BROWN, Justice. I agree with every aspect of the majority decision except one. I fail to see how the evidence was sufficient to prove the rape of Tammy Deal in the "Macaroni Grill" count.

The State presented the following evidence to prove the Macaroni Grill rape:

- That Tammy Deal drank one-and-a-half beers and a glass of wine at dinner and began to feel sick later.

- That she does not remember anything after leaving the restaurant until the following morning when she woke up at the bed-and-breakfast in Warren.

- That she was dressed in a long t-shirt when she awoke at the bed-and-breakfast and felt ill the rest of the day.

There was no proof of any sexual encounter offered in connection with this incident. The video tapes depicted proof of rapes involved in other counts.

The State argues that proof of other criminal wrongs such as the Rohypnol-induced rapes of Ms. Deal in the Monticello count and Jackie Haygood as well as Patty Coleman in Missouri, which involved similar surrounding circumstances, provide substantial evidence that Ms. Deal was raped following dinner at the Macaroni Grill. The foundation for the State's position is Ark. R. Evid. 404(b) which reads:

> (b) *Other Crimes, Wrongs, or Acts.* Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

What Rule 404(b) does not say is that proof of other crimes can be used to prove that a particular criminal act was committed.

What is absent in the State's case is any proof that the *act* of rape ever occurred. Rule 404(b) may provide for proof of *intent* based on other criminal wrongs but not proof of the act itself. In every criminal case, the State must prove *corpus delicti,* that is, that an unlawful injury occurred. 1 CHARLES E. TORCIA, WHARTON'S CRIMINAL LAW, § 28 (15th ed. 1993); *Johnson v. State,* 298 Ark. 617, 770 S.W.2d 128 (1990). The primary reason that the State must prove *corpus delicti* is to insure that a person is not convicted of a crime that was never committed. *Hart v. State,* 301 Ark. 200, 783 S.W.2d 40 (1990).

We run a great risk when we presume criminal conduct and convict a person for a crime based on other similar crimes committed by that person, when there is no proof that the criminal act ever occurred. This court has made it clear that we do not presume criminal conduct; rather, that is a matter of proof for the State. *Johnson v. State,* 198 Ark. 871, 131 S.W.2d 934 (1939); *see also* Ark. Code Ann. § 16-89-111(d) (1987) (confession must be supported by proof a crime was committed). The State's burden was to prove the act of rape in connection with the Macaroni Grill count and

this it failed to do. I would reverse the judgment of conviction for rape in the Macaroni Grill count.

IMBER, J., joins.