MEMORANDUM OPINION AND ORDER
 

 CAVANEAU, United States Magistrate Judge.
 

 Steven Sera, an Arkansas Department of Correction inmate, brings this petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his conviction for raping a Bradley County woman while she was under the influence of Rohypnol, the so-called “date rape” drug. For the following reasons, the Court
 
 [1]
 
 finds that the petition should be GRANTED.
 

 I.
 

 Background
 

 In January 1997, Nancy Sera discovered that her husband, Petitioner, was having an extramarital affair. Some time later, she discovered a videotape depicting three sexual encounters between Petitioner and three different women who appeared to be unconscious. One of the women was Nancy Sera’s sister, a college student in Missouri. The other women were identified and contacted, and charges were ultimately brought against Petitioner in Texas, Missouri, and Arkansas for drugging, kidnapping and sexually assaulting the three. Other charges involving an attempted rape were brought regarding a fourth victim in Arkansas.
 

 All of the Arkansas charges went to trial in March 1998 in the Circuit Court of Bradley County, Arkansas. Following a six-day jury trial, Petitioner was convicted of three counts of introduction of a controlled substance into the body of another person, two counts of kidnapping, and one count each of first degree sexual abuse, rape and attempted rape. He was sentenced to a total of thirty years of imprisonment.
 
 [2]
 
 (Resp’t Ex. A.)
 
 [3]
 

 
 *MCXLV
 
 In a direct appeal to the Arkansas Supreme Court, Petitioner raised the following claims: (1) the evidence was insufficient to convict him of the counts arising out of what was referred to as the “Macaroni Grill incident,” which included the rape count; (2) the trial court erred in admitting evidence pursuant to Ark. R. Evid. 404(b); (3) the trial court’s rape shield ruling excluding a consensual act between Petitioner and one of the victims was erroneous and an abuse of discretion because (a) the evidence was relevant under Ark. R. Evid. 401-403, and (b) the rape shield statute was improperly adopted or is unconstitutional; (4) the trial court abused its discretion in allowing Dr. ElSohly, the state’s expert, to testify as to his opinions about the effects of Rohypnol and the urine test results of one of the victims; and (5) the trial court erred in admitting the videotape into evidence because there was evidence of tampering. (Resp’t Ex. B-l, B-2.) His convictions were affirmed.
 
 Sera v. State,
 
 341 Ark. 415, 17 S.W.3d 61 (2000) (Resp’t Ex. C). Petitioner sought rehearing, which was denied on June 29, 2000. (Resp’t Ex. D, E.) He then filed a petition for writ of certio-rari with the United States Supreme Court, (Resp’t Ex. F), which was denied on November 13, 2000.
 
 Sera v. Arkansas,
 
 531 U.S. 998, 121 S.Ct. 495, 148 L.Ed.2d 466 (2000).
 

 There is no evidence or allegation that Petitioner sought any post-conviction relief in state court.
 

 Petitioner then filed this federal habeas petition (docket entry # 1), challenging only one conviction: his conviction for the rape of T.D. in Warren, Arkansas, referred to as the “Macaroni Grill incident” in the state court proceedings. He received a 360-month sentence for this conviction, which is the longest sentence he is serving. He advances one claim:
 

 1. His right to due process was violated because the evidence was insufficient to convict him of rape:
 

 a. There was no evidence of the
 
 corpus delicti, ie.,
 
 sexual contact between Petitioner and the victim in connection with the “Macaroni Grill incident.”
 

 b. He was unconstitutionally convicted of rape through the misuse of evidence admitted under Ark. R. Evid. 404(b).
 

 Respondent concedes (docket entry # 5) that Petitioner is in his custody and has exhausted all non-futile state remedies. Respondent has submitted the abstract of the complete trial proceedings, as well as other state court documents. Petitioner has submitted two supplemental pleadings in support of his claims (docket entries # 8, # 9). At the direction of the Court, the record has been expanded to include relevant portions of the actual trial transcript (docket entries # 13, # 14, # 15).
 
 [4]
 

 II.
 

 Trial Evidence
 

 The extensive evidence at trial
 
 [5]
 
 was summarized by the Arkansas Supreme Court as follows, with the evidence regarding the Macaroni Grill count emphasized here:
 

 In late summer of 1996, Sera [Petitioner] lived with his wife and daughter in
 
 *MCXLVI
 
 Dallas, Texas. There, Sera owned and operated Chandler Lumber Company, named after his daughter. After hearing of the closing of a lumber mill in Warren, Arkansas, Sera began visiting Warren to explore purchasing the property. Sera eventually bought the property and started a mill division of his company in Warren.
 

 The first five counts of the criminal information filed against Sera involve [T.D.]. Toward the end of August or early September, during one of Sera’s visits to Warren to set up the mill, he and a friend went out one night to a local Warren bar called Spanky’s. While there, Sera met [T.D.], and the two spoke for several minutes. The next day Sera sent flowers to [T.D.]. [T.D.] testified that Sera’s gift surprised her. She stated that Sera began calling her at work to ask her out. Initially, she did not accept the invitations, but eventually agreed to date, believing that he was divorced. Soon Sera began buying her clothes and jewelry, including lingerie from Victoria’s Secret. On one occasion, he sent her flowers with a card attached which read, “Every woman needs to know that someone finds them interesting, intelligent and attractive.” On another occasion, he sent her a flower arrangement with a card that read, “I’m leaning more towards one of the best things that ever happened. All my love, Steven.”
 

 When Sera was in Warren on business, he usually resided at one of two bed-and-breakfasts, the Burnett House or the Colvin House. Sera testified that he and [T.D.] mainly spent their time together at the bed-and-breakfasts, often just sitting on the porch and talking. [T.D.] testified that they spent very little time together before the first of the two episodes charged in this case. [T.D.] testified that the two did not start a sexual relationship until after her birthday which was just before Thanksgiving. She indicated their consensual encounter took place at the Burnett House. Sera testified that during the course of their relationship he and [T.D.] were intimate on several occasions.
 

 [T.D.] testified that the first occasion she spent any significant time alone with Sera occurred one afternoon in October when her cousin ... offered to watch [T.D.]’s two sons. [T.D.] told Sera about this, and Sera offered to take [T.D.] to Monticello for the afternoon. Throughout the trial, the facts surrounding this trip are referred to as the “Monticello incident.” [T.D.] agreed and dropped her children off at her cousin’s house. [T.D.] testified that Sera placed a six-pack of beer in a cooler in the trunk of his car. During the trip to Monticello, Sera pulled off the road and asked [T.D.] if she wanted a beer. She agreed, and he stepped to the back of the car to get the drink. [T.D.] testified that he remained at the rear of the car for quite some time which prompted her to ask what was taking him so long. He responded that he was mixing a drink for himself. When he returned, he handed [T.D.] the beer, and they continued driving. The couple pulled over again after [T.D.] finished the first beer, and Sera got her another one. [T.D.] testified that from that point she did not remember much of the remainder of the trip back from Monticello. Sera later told her she consumed two or three more of the beers on the way back. [T.D.] has no memory of this or most of the events of the afternoon. According to [T.D.], the next thing she clearly remembered was going to her cousin’s house to pick up her children.
 

 The couple next went on a trip together to a casino in Greenville, Mississippi. [T.D.] testified that they both consumed alcohol, and that she did not remember
 
 *MCXLVII
 
 much about the ride back to Warren. Her next memory was waking up on the couch in the living room the next morning at the Burnett house. Again, [T.D.] testified that Sera insinuated that she had had too much to drink the day before.
 

 The couple’s third out-of-town trip involved a trip from Warren to Little Rock for dinner at the Macaroni Grill restaurant. According to [T.D.], Sera bought two individual cans of beer on the way to Little Rock, and that she drank one of them, and took a few drinks from the other. During dinner, [T.D.] recalls drinking a glass of wine and a glass of water. Towards the end of dinner, [T.D.] left the table to go to the bathroom. According to [T.D.j’s testimony, she returned to the table and finished her water, and soon thereafter began to feel ill. Her last recollection of the evening was walking to the car in the restaurant parking lot. She testified that she did not recall any of the 100-mile trip home to Warren, and that the next time she was aware, she was waking up in bed with Sera the next morning at the Burnett House. She continued to feel sick for the rest of the day and evening, with stomach cramps and nausea. During trial, the parties referred to this third trip as the “Macaroni Grill incident.”
 

 According to [T.D.], the couple’s one and only consensual intimate encounter occurred in November around the time of her birthday. Sera had given [T.D.] several birthday presents, including a pearl necklace and earrings, and the couple met at the Burnett House before Sera went out of town on a business trip. [T.D.] testified that Sera did not videotape their tryst and that she was conscious throughout. She further recalled that she returned to the Burnett House to see Sera the next evening on. his invitation, but that he was not there.
 

 [T.D.] concluded her testimony by relating to the jury an account of her last contact with Sera. In early December, she went to the Burnett House to return somé of the presents Sera had given her. [T.D.] recounted that when she approached the Burnett House, she observed Sera holding an unconscious woman in his arms while trying to unlock the door. [T.D.] recognized this woman as [J.H.]. [J.H.] is the other victim in this case. According to [T.D.j’s testimony, she greeted Sera, who acted “startled” and “nervous.” [T.D.] spoke, saying, “I see you have your hands full.” Sera responded that he would call her the next morning, and then she left.
 

 At the time, [T.D.] assumed [J.H.] must have been drunk and had passed out. The events [T.D.] witnessed on the steps of the Burnett House that night underlie the three remaining counts of the eight counts charged against Sera. These counts involve the attempted rape, kidnapping, and introduction of a controlled substance into [J.H.] by Sera.
 

 At trial, [J.H.] testified to the events leading up to what [T.D.] witnessed on the Burnett House steps. Sera’s contacts with [J.H.] coincided with his business trips to Warren during the second half of 1996. Sera became friends with [J.H.] through his acquaintance with her husband, Gary. Gary was an employee of Sera’s company, and [J.H.] assisted the company to get its mill offices established. According to both Sera and [J.H.], Sera understandably spent considerable time with [J.H.] and her husband, because they worked together. Sera testified that he considered [J.H.] a very close friend and even called her “Little Sis.” [J.H.] also testified that she thought of Sera as a good friend.
 

 According to [J.H.], on December 12, 1996, Sera arranged for [J.H.j’s husband to be out of town overnight on a busi
 
 *MCXLVIII
 
 ness trip to some out-of-state mills. That evening, Sera and [J.H.] drove to Little Rock to buy supplies for the office, a trip which had been planned for several days. Sera and [J.H.] stopped in Pine Bluff on the way to Little Rock to buy some alcohol. Sera purchased a small bottle of tequila and eight premixed margaritas. Sera put the drinks in an ice chest in the back of his Range Rover. [J.H.] testified that she drank one of the premixed margaritas out of the bottle, and the two split some of the others. By [J.HJs count, she drank one, poured one out in Little Rock, Sera poured one out, and three-and-a-half were left the next day.
 

 After they returned to Warren from Little Rock and unloaded some of the supplies in the truck, [J.H.] called her husband from the mill at approximately 9:25 to 9:30 p.m. to let him know that she was home from her trip. [J.H.] testified that when she walked out of the mill office, Sera had lowered the tailgate to the truck, and was holding two plastic cups with tequila in them. Sera handed [J.H.] one of them. Sera admitted that he had put one or two Rohypnol tablets and a Vicodin-EX analgesic in one of the cups. He testified that he prepared that particular drink for himself. However, it is undisputed that he gave the drink containing the narcotics to [J.H.] who drank it. Immediately, she noticed a gritty substance in the bottom of the cup. According to [J.H.], she promptly asked Sera what he had put in her cup. He denied that anything was in the cup. According to his testimony, he initially denied putting anything in her cup, but knew that he was going to have to explain things to [J.H. and her husband] and his business partner. According to [J.HJs testimony, she soon felt the effects of the drugs, and could not remember going home that evening. A short time later, [T.D.] observed an unconscious [J.H.] in Sera’s arms at the Burnett house as mentioned above.
 

 Sera testified that once he realized what had happened, he decided he needed to take her home. He denied taking her to the bed-and-breakfast where he was staying on that trip, and contended that [T.D.] lied when she testified that she saw Sera holding [J.H.] and trying to open the door that night at the Burnett house. According to Sera’s testimony, he drove [J.H.] home and took her into her house. There, he met [J.HJs son, Chad, who helped Sera put [J.H.] into bed. Chad acknowledges greeting Sera and helping his unconscious mother to bed. Chad recalled Sera telling him that [J.H.] had had too much to drink that night. Chad also testified that Sera brought [J.H.] into the house at approximately 9:45 or 10 p.m. When Sera returned to his car, he called [J.HJs husband and told him that he had taken [J.H.] home and put her to bed because she was drunk. However, he did not tell [J.H.] or her husband that [he] had allowed her to unknowingly ingest narcotics.
 

 [J.HJs next memory was waking up in her bed the next morning and feeling very sick and very uncoordinated. She could not remember how she got there. [J.H.] testified that she called Sera and again asked what he had given her. Again, he blamed her condition on over-drinking, which she denied. [J.H.] actually rode with Sera to work that day, but testified that she felt bad the whole day. That evening, knowing something had happened, [J.H.] saw her doctor who took a urine sample to be sent to a lab and tested. The test later returned showing a positive indication of Rohyp-nol in [J.HJs urine.
 

 [J.H.] and Sera had several contacts oyer the following days. [J.H. and her husband] informed Sera as well as
 
 *MCXLIX
 
 Sera’s business partner about the drug-screening results. After learning of this, Sera fired [J.H.], but later apologized for doing so. According to [J.H.], Sera called her house repeatedly begging her not to pursue the matter because he would “lose everything” if she did. Ultimately, Sera sold the company to his partner to be relieved of the situation.
 

 Sera,
 
 17 S.W.3d at 64-67 (emphasis added). According to the Arkansas Supreme Court, as these events unfolded in Arkansas, others transpired in Texas and Missouri. The court detailed the testimony of the other two women appearing in the videotape: M.H., a woman Petitioner met in a Texas restaurant in November 1996, and P.C., Nancy Sera’s sister who was attending college in Springfield, Missouri. Both women testified in great detail to a similar pattern of Petitioner courting them with gifts of clothing, lingerie, jewelry and flowers. M.H. testified about two occasions on which she began the evening with Petitioner, felt sick at some point, and woke up the next morning with little or no memory of the night’s events. P.C. testified about a similar episode with Petitioner, where she woke up in his hotel room wearing one of his t-shirts.
 
 Id.
 
 at 67-68, 70-71.
 

 The court continued its summary:
 

 All of these apparently isolated events eventually became related and took on a more sinister light after Sera’s wife, Nancy, filed for divorce in Texas. She did so after learning of Sera’s affair with [M.H.]. According to [M.H.], she received a message from Nancy Sera on January 18, 1997, in which Nancy explained that Sera and Nancy were married and that Nancy was over seven months pregnant. Nancy requested that [M.H.] call her. [M.H.J did not call Nancy, and attempted to avoid Sera’s calls for several days. Finally, she spoke to Sera on January 24, 1997, and told him that she did not want to see him anymore. [M.H.] testified that Sera, at first, acted confused and stated that he thought they had a good relationship. [M.H.] then told Sera that she knew Nancy was still married to him and that she was pregnant. According to [M.H.], Sera called Nancy a “lying bitch” and claimed that they had not been intimate for over a year and that the child was not his. After this conversation, Sera showed up at [M.HJ’s apartment several times, but [M.H.] refused to answer the door.
 

 Nancy testified that until mid-1996, she believed she and Sera had a strong marriage, and she became pregnant with the couple’s second child in July, 1996. She testified that Sera was “thrilled” with the news. But, by early 1997 she suspected Sera was having an affair, and confirmed this during the [M.H.] incident. According to Nancy, in December 1996, a man came to the door, and Sera pretended to be his own brother, Tony, when he spoke to the man. She identified the person at the door as Fred Daugherty. Daugherty later became the private investigator for Nancy’s divorce attorney. According to Nancy, she found the videotape sometime in mid-June 1997 after she and Sera had separated. Sera’s testimony contradicted her and he contended that Nancy found the tape much earlier. Nancy explained that she had gone to their house (she was living in an apartment at the time) to get the video camera Sera had purchased to record an upcoming family event. Nancy still had a key and thus access to the home. After returning to her apartment, she checked the videotape in the camera and saw the videotaped incidents of Sera with three women including her own younger sister, [P.C.]. Nancy called her divorce attorney who told her to give the tape to Daugherty who in turn gave it to the
 
 *MCL
 
 police after having copies made. Daugherty had it copied onto some VHS tapes at a video store where he took many of his work projects.
 

 Nancy also testified that once when she cleaned out Sera’s suitcase after a trip, she found a bottle labeled “Rohyp-nol,” and she hid the bottle with several pills in it. When Sera looked for his pills, he became very upset when he could not find them, according to Nancy. Nancy eventually gave this bottle to Daugherty in the course of. his investigation.
 

 When Nancy confronted Sera about the tape and told him that she had taken it to the police, he told her that if she didn’t get the tape back, he would go to jail. He then took their daughter Chandler and left town for several days. Nancy and Daugherty returned to the house some time later, and Daugherty searched the house and took packets of medicine from Sera’s shaving kit.
 

 The Colleyville, Texas, police department reviewed the tape. They contacted [M.H.] who came down and viewed the tape. After witnessing it, she became physically sick according to the testimony of an Officer Badillo of the Colleyville police. The Texas authorities contacted their Arkansas counterparts when they suspected an Arkansas resident might be included on the tape. They were correct. [T.D.] was eventually identified as one of the women appearing on the tape. She, too, expressed disgust and shock upon being informed of her appearance on the videotape.
 

 On July 14, 1997, the Bradley County prosecutor filed original charges against Sera consisting of six counts arising out of incidents with [J.H.] and [T.D.], the two Arkansas victims. Several pretrial motions were filed by the State and the defense. In particular, Sera filed motions to declare the rape-shield statute unconstitutional and to exclude the testimony and evidence from [M.H.] and [P.C.]. The State amended the felony information on December 15, 1997, to then state eight counts. A brief summary of those counts follows:
 

 Counts one and two:
 

 1. Administering or causing to be ingested, inhaled or otherwise introduced into [T.D.] a Schedule IV controlled substance, Rohypnol — Class C felony;
 

 2. Engaging in sexual intercourse or deviate sexual activity with [T.D.] when she was incapable of consent due to the drugs without her knowledge or consent — Class Y felony.
 

 Counts three, four, and five:
 

 3. Administering or causing to be ingested, inhaled or otherwise introduced into [T.D.] a Schedule IV controlled substance, Rohypnol — Class C felony;
 

 4. Restraint of [T.D.] without consent for the purposes of engaging in sexual intercourse, deviate sexual activity or sexual contact with her — Class B felony;
 

 5. Engaging in sexual intercourse or deviate sexual activity with [T.D.] when she was incapable of consent due to the drugs without her knowledge or consent — Class Y felony.
 

 Counts six, seven, and eight:
 

 6. Administering or causing to be ingested, inhaled or otherwise introduced into [J.H.] a Schedule IV controlled substance, Rohypnol — Class C felony;
 

 7. Restraint of [J.H.] without consent for the purposes of engaging in sexual intercourse, deviate sexual activity or sexual contact with her — Class B felony;
 

 8. Engaging in conduct intended to culminate in the commission of the offense of rape upon [J.H.] — Class Y felony.
 

 The trial court held a pretrial hearing to determine if the testimony of [M.H.]
 
 *MCLI
 
 and [P.C.] should be excluded. After the hearing, the trial court denied the defense’s motion to exclude the evidence in an order on December 19, 1997. The trial court later held another hearing to determine the constitutionality of the rape-shield statute and the admission of certain evidence under that statute on February 17, 1998. In due course, the trial court denied Sera’s motions.
 

 The jury trial began on March 10, 1998, and continued six days. During the trial, the State presented numerous witnesses, including [J.H.] and her son Chad, Nancy Sera, Daugherty, [T.D.], [T.D.’s cousin], [P.C.], Officer Badillo, and [M.H.]. Other relevant State witnesses included two experts, Dr. Mah-moud ElSohly and Dr. James Tolliver, who testified regarding the history and effects of Rohypnol.
 

 Dr. ElSohly, a pharmacologist who created a test for Hoffman-LaRoche, the manufacturer of Rohypnol, to detect the presence of Rohypnol in human test samples, testified regarding the pharmacological effects of the drug. Dr. ElSohly testified that Rohypnol is in the class of drugs called benzodiazepines, a class which includes Valium, and that the effects of the drug on the human body can include hypnosis, or sleep, total muscle relaxation, and loss of memory. Dr. El-Sohly also described the test he developed to detect the presence of Rohypnol metabolites in urine samples to determine if and when someone had ingested the drug. It was this test that Dr. ElSohly’s private lab conducted on [J.HJ’s urine sample sent to them by Dr. Pennington, [J.HJ’s physician in Warren.
 

 Regarding that test, Dr. ElSohly testified that a person in his lab conducted the test and found the presence of the metabolites, and that he reviewed the test results and signed off on them before returning the results to Dr. Pennington. Finally, Dr. ElSohly testified that after reviewing the videotape of the episodes involving [P.C.], [T.D.], and [M.H.], he believed that it was possible that these women were under the influence of Rohypnol, but could not rule out different drugs, as well.
 

 Dr. Tolliver, a pharmacologist with the Drug Enforcement Agency, testified extensively regarding his familiarity with Rohypnol and his studies and research projects on the drug. Dr. Tolliver testified that Rohypnol is not legal in the United States, but that it is sold outside of the country in countries such as Mexico. Dr. Tolliver testified that as part of his job with the DEA, he has studied the uses of the drug in medical fields, as well as how the drug was being misused in the United States. Dr. Tol-liver noted that he has participated in several workshops in Virginia regarding the use of Rohypnol in sexual-assault cases, and he testified regarding his experience and knowledge about the five main effects of the drug on the human body. He, too, indicated that Rohypnol will cause hypnosis, relieve anxiety, have an anti-convulsive effect, relax skeletal and smooth muscles, and cause antero-grade amnesia, which is the failure to remember things that happen while under the influence of the drug. Dr. Tol-liver testified that depending on the amount of the drug taken and at what point the drug is taking effect, a person can be talking and functioning and still not be able to remember what happened during that time. Because Rohypnol is a depressant, its effects can be as far-reaching as causing death when too large a dose is ingested. This is caused by the depression of the respiratory system, making it difficult or impossible to breathe. Furthermore, Dr. Tolliver
 
 *MCLII
 
 stated that combining Rohypnol with another drug such as alcohol causes a magnification of the effects of the drug. This can cause a deeper state of unconsciousness, [and] it would require a greater amount of stimulus to awaken the person affected by the drug. He pointed out that the onset of the reaction to the drug can take anywhere from fifteen to thirty minutes, depending on whether the drug is taken in tablet form or whether it is ground up into a powder-like substance. In addition, Dr. Tol-liver stated that his studies on the drug included dissolving it into several types of alcoholic drinks, and he noted that the drug would “fizz” in carbonated drinks until dissolved while it would not in un-carbonated drinks. Dr. Tolliver testified that one of the side effects of the drug was gastrointestinal problems and cramping, and that this effect could be increased when the drug is combined with alcohol or other drugs. Finally, Dr. Tolliver, after viewing the videotape, opined that he believed that the victims’ behavior was consistent with the effects of Rohypnol. He did not believe that alcohol, in the amounts taken as indicated by the victims, would produce- the effects he saw on the videotape.
 

 At the close of the State’s case, Sera moved for directed verdict as to count one, count three, and count five. Sera contended there was no evidence on count one or count three that Sera introduced a drug into [T.D.]. Also, he argued that count five should be dismissed because there was no evidence that deviate sexual activity took place. The State responded arguing that the expert testimony showed the victim’s behavior was consistent with Rohypnol ingestion and that she regained consciousness in the defendant’s bed dressed only in a t-shirt. The State also pointed to evidence from other witnesses which indicated a pattern and plan by Sera. The court denied Sera’s motion.
 

 The defense presented testimony from seventeen witnesses in its case. Sera testified on his own account....
 

 At the close of the defense’s case, Sera renewed his directed-verdict motion. In addition to the three counts raised earlier, he attempted to add counts two (rape) and four (kidnapping) to the motion neither of which were raised in the prior motion. The trial court again denied the motion, and the case went to the jury. The jury convicted Sera on all eight counts, and sentenced him to a term of years on each respective count totaling eighty-five years. The jury recommended the sentences run concurrently. The longest single sentence was thirty years for rape. Count five involving [T.D.] in the “Macaroni Grill” incident was the only rape conviction. Sera appealed his conviction on March 30, 1998, in a timely manner.
 

 Id.
 
 at 68-72 (emphasis added).
 

 III.
 

 Arguments
 

 Petitioner alleges that the evidence at trial was insufficient to support his rape conviction in connection with the Macaroni Grill incident as charged in Count 5, in violation of the Due Process Clause of the United States Constitution. In support, he says that there was no evidence of the
 
 corpus delicti,
 
 i.e., that any sexual contact occurred, which is an essential element of a rape charge; that the state courts improperly relied upon “other acts” evidence admitted under Ark. R. Evid. 404(b)
 
 [6]
 
 to
 
 *MCLIII
 
 find direct evidence of the
 
 corpus delicti;
 
 and that the state courts ignored the Rule 404(b) limiting instructions. He says the conviction was thus based on speculation and that the misuse of the Rule 404(b) evidence rendered his trial fundamentally unfair in violation of due process.
 

 Petitioner’s insufficiency claim was raised and rejected in his direct appeal. Respondent asserts that this Court is bound by the Arkansas Supreme Court’s decision on the issue.
 

 IV.
 

 Law
 

 In the interests of finality and federalism, a federal habeas court is constrained by statute to exercise only a “limited and deferential review of underlying state court decisions.”
 
 Whitehead v. Dormire,
 
 340 F.3d 532, 536 (8th Cir.2003). Thus, where a state court has previously adjudicated a claim on the merits, a federal habeas court cannot grant habeas relief for the same claim unless the state court adjudication “(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.” 28 U.S.C. § 2254(d).
 

 A state court decision is “contrary to” federal law under § 2254(d)(1) if it (a) applies a rule that contradicts the controlling Supreme Court authority or (b) applies the controlling authority to a case involving facts “materially indistinguishable” from those in a Supreme Court case, but nonetheless reaches a different result.
 
 Williams v. Taylor,
 
 529 U.S. 362, 405-06, 412-13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state court’s decision involves an “unreasonable application” of federal law under § 2254(d)(1) if it “identifies the correct governing legal principle from [the Supreme Court’s] decisions but unreasonably applies that principle to the facts of the prisoner’s case.”
 
 Id.
 
 at 413, 120 S.Ct. 1495.
 

 Under § 2254(d)(2), a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless it is objectively unreasonable in light of the evidence presented in the state court proceeding.
 
 Miller-El v. Cockrell,
 
 537 U.S. 322, 123 S.Ct. 1029, 1041, 154 L.Ed.2d 931 (2003). In making this determination, factual findings by the state courts are presumed correct absent clear and convincing evidence to the contrary.
 
 Id.;
 
 28 U.S.C. § 2254(e)(1).
 

 The inquiries under § 2254(d)(1) mandate an examination of “clearly established Federal law, as determined by the Supreme Court of the United States.”
 

 As interpreted by the United States Supreme Court, the Due Process Clause of the Fourteenth Amendment guarantees that “no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof — defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense.”
 
 Jackson v. Virginia,
 
 443 U.S. 307, 316, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (citing
 
 In re Winship,
 
 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970)). Clearly, a “conviction based on a record wholly devoid of any relevant evidence of a crucial element of the offense charged is constitutionally
 
 *MCLIV
 
 infirm.”
 
 Id.
 
 at 314, 99 S.Ct. 2781;
 
 see also Fiore v. White,
 
 531 U.S. 225, 229, 121 S.Ct. 712, 148 L.Ed.2d 629 (2001);
 
 Vachon v. New Hampshire,
 
 414 U.S. 478, 480, 94 S.Ct. 664, 38 L.Ed.2d 666 (1974). The evidence presented at a trial is constitutionally insufficient to convict only if “no rational trier of fact could have found proof of guilt beyond a reasonable doubt.”
 
 Jackson,
 
 443 U.S. at 324, 99 S.Ct. 2781. In making this determination, all of the trial evidence is to be viewed in the light most favorable to the state.
 
 Id.
 
 at 319, 99 S.Ct. 2781. A reviewing court must presume that the trier of fact resolved all conflicting inferences in the record in favor of the state and must defer to that resolution.
 
 Id.
 
 at 326, 99 S.Ct. 2781.
 

 The substantive elements of state crimes are defined by state law.
 
 Id.
 
 at 324 n. 16, 99 S.Ct. 2781. To convict Petitioner of rape under applicable Arkansas law, a jury must have been able to find from the evidence, beyond a reasonable doubt, that Petitioner “engage[d] in sexual intercourse or deviate sexual activity with another person ... who [was] incapable of consent because [the person was] physically helpless.” Ark.Code Ann. § 5-14-103(a)(2)
 
 (1995).
 

 [7]
 

 V.
 

 Arkansas Supreme Court’s Decision
 

 In evaluating the evidence supporting the Macaroni Grill count, the Arkansas Supreme Court stated:
 

 The test for determining sufficiency of the evidence is whether there is substantial evidence to support the verdict. On appeal, we will review the evidence in the light most favorable to the appellee and sustain the conviction if there is any substantial evidence to support the verdict. Evidence is substantial if it is of sufficient force and character to compel reasonable minds to reach a conclusion and pass beyond suspicion and conjecture. Only evidence supporting the verdict will be considered. It is important to note that the court will make no distinction between circumstantial and direct evidence when reviewing for sufficiency of the evidence. However, for circumstantial evidence to be sufficient, it must exclude every other reasonable hypothesis consistent with innocence. Whether the evidence excludes every hypothesis is left to the jury to determine.
 
 Williams v. State,
 
 338 Ark. 97, 991 S.W.2d 565 (1999). Guilt may be proved in the absence of eyewitness testimony, and evidence of guilt is not less because it is circumstantial.
 
 Trimble v. State,
 
 316 Ark. 161, 871 S.W.2d 562 (1994).
 

 Regarding the sufficiency of the evidence on counts three and five, we hold the evidence to be sufficient. The evidence was not such that the jury was reduced to mere speculation and conjecture. It was not speculation for the jury to believe [T.D.]’s testimony that she had not had too much to drink. Nor was it conjecture for the jury to believe that [T.D.]’s lack of memory was due to a documented side effect of Rohypnol ingestion known as anterograde amne
 
 *MCLV
 
 sia. As Dr. Tolliver testified, “While you are actually under the effect of the drug, you may not remember some of the things you do or some of things that are done to you or what conversations you have or what is, what your experiences are.” Dr. Tolliver further stated, “You can actually be functioning. You can be talking. You can be carrying on a conversation just like we are now and you may remember a little bit of it or you may, even may remember all of it or you . may remember none of it or you may remember part of it.” Regarding the “Macaroni Grill” incident, Dr. Tolliver stated that [T.DJs complaints of not being able to remember the trip home from the restaurant, and the stomach pains and cramping she experienced, would also be consistent with Rohypnol ingestion, especially when taken with alcohol. The sickness she felt was consistent with [T.DJs experience after the “Monticello” incident in which the videotape shows unequivocally that she was unconscious throughout most of the sexual encounter and, in fact, snored occasionally. The evidence showed that during the relevant time period Sera had access to the drug Rohypnol. Clearly, Sera had the opportunity, the scheme, or plan in place, and he had already carried it out on one prior occasion with [T.D.]. The jury could reasonably conclude that [T.DJs surprise awakening the next morning in Sera’s bed in a state of relative undress to be consistent with sexual activity of a nonconsensual nature.
 

 Sera offered to the jury a hypothesis consistent with his innocence, i.e., that [T.D.] merely had too much drink, that no sex occurred, and that [T.D.] was participating in a conspiracy against him. However, the jury did not have to accept it as a reasonable hypothesis and apparently rejected it. We cannot say that they did so without substantial evidence. We have long held that the trier of fact is free to believe all or part of a witness’s testimony.
 
 Stewart v. State,
 
 338 Ark. 608, 999 S.W.2d 684 (1999). The credibility of witnesses is an issue for the jury and not for this court.
 
 Marta v. State,
 
 336 Ark. 67, 983 S.W.2d 924, 928 (citing
 
 Sanford v. State,
 
 331 Ark. 334, 962 S.W.2d 335 (1998);
 
 Bell v. State,
 
 334 Ark. 285, 973 S.W.2d 806 (1998)). Further, the jury may resolve questions of conflicting testimony and inconsistent evidence and may choose to believe the State’s account of the facts rather than the defendant’s.
 
 Bell, supra.
 

 Sera,
 
 17 S.W.3d at 73, 75-76 (parallel citations omitted).
 

 VI.
 

 Analysis
 

 The test applied by the Arkansas Supreme Court, although based on state law, does not contradict the reasoning or holding of
 
 Jackson
 
 or
 
 Winship. See Mitchell v. Esparza,
 
 — U.S. -, -, 124 S.Ct. 7, 10, 157 L.Ed.2d 263 (2003) (it is not necessary for the state court to cite, or even be aware of, applicable United States Supreme Court opinions, as long as “neither the reasoning nor the result of the state-court decision contradicts them”). If anything, the standard is more restrictive because, in
 
 Jackson,
 
 the United States Supreme Court specifically rejected the theory that the prosecution was under an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt.
 
 Jackson,
 
 443 U.S. at 326, 99 S.Ct. 2781.
 
 See also Holland v. United States,
 
 348 U.S. 121, 140, 75 S.Ct. 127, 99 L.Ed. 150 (1954) (rejecting contention that circumstantial evidence must exclude every hypothesis but that of guilt). Moreover, neither party contends that the United States Supreme Court has addressed a case with facts that are “materially indis
 
 *MCLVI
 
 tinguishable” from those involved here. Therefore, the state supreme court’s decision was not “contrary to” applicable United ■ States Supreme Court law under § 2254(d)(1).
 

 The next test is whether the governing federal law was unreasonably applied under the second phrase of § 2254(d)(1). The focus of this inquiry is “whether the state court’s application of clearly established federal law [was] objectively unreasonable.”
 
 Bell v.
 
 Cone, 535 U.S. 685, 694, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002). Thus, a federal habeas court may not find a state adjudication to be unreasonable “simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.”
 
 Williams,
 
 529 U.S. at 411, 120 S.Ct. 1495. This Court, therefore, may not grant a writ “unless the relevant state court decision is both wrong and unreasonable.”
 
 Williams v. Bowersox,
 
 340 F.3d 667, 670 (8th Cir.2003).
 

 Jackson
 
 and
 
 Winship
 
 require “evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense.” As stated earlier, the essential statutory elements to be proven here were: (1) sexual intercourse or deviate sexual activity (2) with a physically helpless person. The second element is not now in controversy,
 
 [8]
 
 nor does Petitioner contest the findings that the victim’s symptoms were consistent with Rohypnol ingestion and that Petitioner had access to Rohypnol. The crucial issue here, as this Court sees it, is whether a rational trier of fact could find beyond a reasonable doubt that “sexual intercourse” or “deviate sexual activity” occurred on the night that Petitioner and T.D. went to the Macaroni Grill.
 

 The evidence in the trial record concerning that incident, construed in the light most favorable to the state, is as follows:
 

 (1) Petitioner and T.D. were involved in a dating relationship but did not engage in consensual sex until mid-November, which was after the Macaroni Grill incident.
 

 (2) On the night in question in late October or early November, they drove from Warren to Little Rock for dinner at the Macaroni Grill. T.D. wore jeans and a button-down shirt. During the evening, she consumed one and one-half beers, one glass of wine, and one glass of water.
 

 (3) Toward the end of dinner, she left the table to go to the bathroom. She returned, finished her water and soon began to feel ill.
 

 (4) She remembered walking to the car in the restaurant parking lot.
 

 (5) Her next recollection was waking up in bed the next morning at the Burnett House bed-and-breakfast in Warren, wearing a long t-shirt. Pe
 
 *MCLVII
 
 titioner was there, and he was wearing shorts and a t-shirt.
 

 (6) She could not tell if she had had sex.
 

 (7) Petitioner told her she had gotten sick and he had taken care of her.
 

 (8) She felt ill for the rest of the day, with stomach cramps, nausea, diarrhea and vomiting.
 

 (Tr.2013-20, 2022-23, 2043, 2056-60.)
 

 In finding the evidence to be sufficient as to this rape conviction, the state supreme court also expressly relied upon the circumstances surrounding the “Monticello incident.” According to the evidence at trial, about two weeks before the Macaroni Grill events, T.D. and Petitioner went to Monticello for the afternoon to “ride around.” She drank two beers, which Petitioner obtained from a cooler in the trunk of his car. Although she “vaguely” remembered picking up her children at her cousin’s house in Warren several hours later, her next clear memory was not until the next morning when she woke up at home. Her cousin testified that, when Petitioner and T.D. came to pick up the children, T.D. appeared “drowsy” and her undershirt and socks were missing. (Tr. 2001-07,2049-53; Abst. 173-74.) A videotape was shown at trial of Petitioner and T.D. engaging in sexual intercourse at the Colvin House bed-and-breakfast. According to the videotape transcript, it is daylight and a clock chimes five times, indicating 5:00 p.m. T.D. appears to be snoring at one point. (Abst.265.) T.D. testified that she believed this encounter occurred on the afternoon they went to Monticello, although she had no memory of it and, afterward, could not tell if she had had sex. (Tr.2050-51, 2054-55.) The Arkansas Supreme Court stated that the video “shows unequivocally” that T.D. was unconscious throughout most of the sexual encounter.
 
 Sera,
 
 17 S.W.3d at 75-76.
 

 To reiterate, the state supreme court stated in its opinion that the sickness T.D. felt at the Macaroni Grill restaurant “was consistent with [her] experience after the ‘Monticello incident’ ” and that Petitioner clearly “had the opportunity, the scheme, or plan in place, and he had already carried it out on one prior occasion with [T.D.].”
 
 Id.
 
 The supreme court then found, based on the evidence, that “[t]he jury could reasonably conclude that [T.DJ’s surprise awakening the next morning in Sera’s bed in a state of relative undress to be consistent with sexual activity of a non-consensual nature.”
 
 Id.
 
 at 76. These statements were the basis for its decision that the evidence was sufficient to support Petitioner’s rape conviction. For the reasons that follow, this Court finds that the state supreme court’s ultimate decision was an unreasonable application of clearly established United States Supreme Court law.
 

 While Petitioner contends that the evidence cannot support a finding of
 
 any
 
 sexual activity whatsoever, the Court believes that a rational fact-finder could properly draw an inference from the evidence outlined above that some sort of nonconsensual sexual encounter occurred. However, the jury did not convict Petitioner of engaging in nonconsensual “sexual activity” with T.D.; he was convicted of rape, which means either nonconsensual
 
 “sexual intercourse or deviate sexual activity.
 
 ” This distinction is important.
 

 Under Arkansas law at the relevant time, sexual activity with a physically helpless person could constitute either first-degree sexual abuse or rape. A conviction for first degree sexual abuse, carrying a penalty of up to ten years, required only “sexual contact,” which is defined as “any act of sexual gratification involving the touching, directly or through clothing, of the sex organs, or buttocks, or anus of a person or the breast of a female.” Ark. Code Ann. §§ 5-14-108(a)(2)
 
 &
 
 (b), 5-14-
 
 *MCLVIII
 
 101(8), 5-4-401(a)(4) (1995).
 
 [9]
 
 In contrast, a rape conviction carries a
 
 minimum
 
 penalty of ten years and a maximum penalty of life imprisonment, and it expressly requires “sexual intercourse or deviate sexual activity.”
 
 Id.
 
 §§ 5-14-103(a)(2) & (b), 5-4-401(a)(l). The statutes define sexual intercourse as the “penetration, however slight, of the labia majora by a penis.”
 
 Id.
 
 § 5-14-101(9). “Deviate sexual activity” is defined as “any act of sexual gratification involving ... the penetration, however slight, of the anus or mouth of one person by the penis of another person; or ... the penetration, however slight, of the labia majora or anus of one person by any body member or foreign instrument manipulated by another person.”
 
 Id.
 
 § 5-14-101(1).
 

 Thus, the required conduct for rape is more specifically defined than that for sexual abuse (basically, sexual contact plus penetration),
 
 [10]
 
 and the concomitant penalties are greater. It is established Supreme Court law that “facts that increase the prescribed range of penalties to which a criminal defendant is exposed ... must be established by proof beyond a reasonable doubt.”
 
 Apprendi v. New Jersey,
 
 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). “The constitutional necessity of proof beyond a reasonable doubt is not confined to those defendants who are morally blameless.”
 
 Jackson,
 
 443 U.S. at 323-24, 99 S.Ct. 2781 (“Under our system of criminal justice even a thief is entitled to complain that he has been unconstitutionally convicted and imprisoned as a burglar.”). Therefore, the additional elements which distinguish rape from a lesser offense must be proven beyond a reasonable doubt.
 

 T.D. could not testify that any sexual activity whatsoever occurred, much less the particular acts required by the rape statute. There was no physical evidence and no confession by Petitioner. There were no witnesses. This was not the episode with T.D. depicted on videotape because it occurred after dark and at the Burnett House; whereas, their only videotaped encounter occurred during the daytime and at the Colvin House. While the Court cannot accept Petitioner’s argument that the record is devoid of
 
 any
 
 evidence supporting
 
 any
 
 inference of
 
 any
 
 sexual contact, it takes a greater leap to draw the further inference that the encounter involved sexual intercourse or deviate sexual activity as specifically required and defined by the statutes.
 

 The only evidence of these particular acts, as relied upon by the Arkansas Supreme Court, is the prior videotaped encounter between Petitioner and T.D., that is, the Monticello incident occurring about two weeks before the Macaroni Grill events. The videotape transcript clearly describes the requisite acts, and there are many similarities between the two incidents. In both, T.D. consumed drinks provided by Petitioner or to which Petitioner had access, and she had no memory of the next few hours. In both incidents, she could not tell if she had had sex and there was no physical evidence that any sexual activity had occurred, but her clothes were in disarray or had been changed. Peti
 
 *MCLIX
 
 tioner denied any sexual activity as to both occasions. (Abst.357, 359-60.) Significantly, however, the jury found that the acts portrayed in the videotaped Monticello incident constituted first-degree sexual abuse, rather than the greater offense of rape.
 

 The Arkansas Supreme Court expressly relied upon the facts of the Monticello incident in sustaining the Macaroni Grill rape conviction. As shown above, it was the only evidence mentioned by the court which even suggests sexual intercourse or deviate sexual activity. The question is whether this was an objectively unreasonable application of the principle set forth in
 
 Jackson
 
 and
 
 Winship
 
 that the trial evidence must be sufficient to convince a rational fact-finder of every element of a crime beyond a reasonable doubt.
 

 The Latin words
 
 “corpus delicti”
 
 mean literally, “the body of the crime.” Black’s Law Dictionary 346 (7th ed.1999). The
 
 corpus delicti
 
 must be established by the prosecution, meaning that the prosecution must show “that the alleged injury to the victim occurred and that a person caused it.”
 
 Howard v. Caspari,
 
 99 F.3d 895, 897 (8th Cir.1996).
 
 See
 
 29 Am.Jur.2d
 
 Evidence
 
 § 174 (2003) (prosecution must establish “the actual commission, by someone, of the particular offense”); 7 John Henry Wigmore,
 
 Evidence
 
 § 2072(3), at 524 (Chadbourn rev.1978)
 
 (corpus delicti
 
 requires a showing of “the
 
 occurrence
 
 of the specific kind of injury or loss”); 1 McCormick on Evidence § 146, at 525 (5th ed.1999) (to establish guilt in a criminal case the prosecution must ordinarily first show that “the injury or harm constituting the crime occurred”);
 
 Lufkins v. Leapley,
 
 965 F.2d 1477, 1482 (8th Cir.1992);
 
 Tinsley v. State,
 
 338 Ark. 342, 993 S.W.2d 898, 899 (1999) (state must prove “the existence of an injury or harm constituting a crime and ... that the injury or harm was caused by someone’s criminal activity”).
 

 The United States Supreme Court has recognized this principle, and it is inherent in its decisions holding that the prosecution must prove all elements of the crime beyond a reasonable doubt.
 
 Jackson,
 
 443 U.S. at 316, 99 S.Ct. 2781 (“the existence of
 
 every element of the offense
 
 ” must be established beyond a reasonable doubt);
 
 Winship,
 
 397 U.S. at 364, 90 S.Ct. 1068 (due process protects accused against conviction except upon proof beyond a reasonable doubt of
 
 “every fact necessary to constitute the crime with which he is charged”); see also Wong Sun v. United States,
 
 371 U.S. 471, 490 n. 15, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) (“Where the crime involves physical damage to person or property, the prosecution must generally show that the injury for which the accused confesses responsibility
 
 did in fact occur,
 
 and that some person was criminally culpable. A notable example is the principle that an admission of homicide must be corroborated by tangible evidence of the death of the supposed victim.... But where the crime involves no tangible
 
 corpus delicti,
 
 we have said that ‘the corroborative evidence must implicate the accused in order to show that a crime has been committed.’ ”) (citing Wigmore § 2072 and
 
 Smith v. United States,
 
 348 U.S. 147, 154, 75 S.Ct. 194, 99 L.Ed. 192 (1954)) (emphasis added);
 
 Smith,
 
 348 U.S. at 153-54, 75 S.Ct. 194 (“In order to convict of serious crimes of violence, then capital offenses, independent proof was required that someone had indeed inflicted the violence, the so-called
 
 corpus delicti.”).
 

 Therefore, the state was required to establish — beyond a reasonable doubt — the actual commission, by someone, of the particular offense charged, which in this case was rape, i.e., sexual intercourse or deviate sexual activity with a physically helpless person. The
 
 corpus delicti
 
 in a rape case may be proved in whole or in part by circumstantial evidence. 65 Am.Jur.2d,
 
 *MCLX
 

 Rape
 
 § 69 (2003). In reviewing the sufficiency of the evidence to support a conviction,
 
 Jackson
 
 mandates that “all of the evidence” must be reviewed.
 
 Jackson,
 
 443 U.S. at 319, 99 S.Ct. 2781. This clearly includes circumstantial evidence. In fact, the Supreme Court has stated:
 

 Admittedly, circumstantial evidence may in some cases point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both, the jury must use its experience with people and events in weighing the probabilities. If the jury is convinced beyond a reasonable doubt, we can require no more.
 

 Holland,
 
 348 U.S. at 139-40, 75 S.Ct. 127.
 

 Nevertheless, while circumstantial evidence can support a conviction, the inferences drawn from such evidence must be reasonable. This is also clear from
 
 Jackson,
 
 where the Supreme Court recognized the responsibility of the trier of fact “to resolve conflicts in the testimony, to weigh the evidence, and
 
 to draw reasonable inferences from basic facts to ultimate facts.” Jackson,
 
 443 U.S. at 319, 99 S.Ct. 2781 (emphasis added). Thus, while deference upon habeas review must be given to the jury’s weighing of the evidence and its drawing of reasonable inferences, “each link in the chain of inferences must be sufficiently strong to avoid a lapse into speculation.”
 
 Piaskowski v. Bett,
 
 256 F.3d 687, 693 (7th Cir.2001). Indeed,
 
 Jackson
 
 requires that the evidence implicate a convicted defendant to “a state of near certitude.”
 
 Jackson,
 
 443 U.S. at 315, 99 S.Ct. 2781.
 

 It is a well-established legal principle that “the doing of one act is in itself no evidence that the same or a like act was again done by the same person.” 1A John Henry Wigmore,
 
 Evidence
 
 § 192, at 1859 (Tillers rev.1983). The reason for this is basic:
 

 Human action being infinitely varied, there is no adequate probative connection between the two.
 
 A
 
 may do the act once and may never do it again; and not only may he not do it again, but it is in no degree probable that he will do it again. The conceivable contingencies that may intervene are too numerous.
 

 Id.
 
 at 1857.
 

 Here, the only evidence relied upon by the Arkansas Supreme Court which indicates “sexual intercourse” or “deviate sexual activity” was the videotape portraying those acts between Petitioner and the victim on a prior occasion. The jury viewed this prior videotaped sexual encounter and determined that it amounted to first-degree sexual abuse. This videotape alone was not sufficient to permit a legitimate, reasonable inference that Petitioner again engaged in those specific acts with the same victim while she was physically helpless the night they went to the Macaroni Grill
 
 and
 
 that, this time, the specific acts constituted rape, rather than sexual abuse. If the jury found the videotaped Monticello incident conduct — which apparently included sexual activity encompassed by the rape statute — to constitute only sexual abuse, then how could the jury find that a sexual encounter not even viewed could meet the more explicitly defined elements of the offense of rape? It is speculative to presume that the jury could find more specific conduct with less specific evidence. Who is to say that what the jury observed on the videotape isn’t what occurred on the second occasion as well? Or perhaps what occurred would have not constituted a criminal offense at all. Or perhaps, as Petitioner testified, nothing of a sexual nature occurred and T.D. simply became ill and spent the night on the couch at the bed-and-breakfast.
 
 (See
 
 Abst. 359-60.)
 

 
 *MCLXI
 
 Viewing the evidence in the light most favorable to the state and presuming that all reasonable inferences were drawn in favor of the state, no rational trier of fact could have found beyond a reasonable doubt from the evidence in the record that Petitioner was guilty of raping the victim as charged in Count 5 of the information and as defined by Arkansas law.
 
 See Ward v. Lockhart,
 
 841 F.2d 844, 847-48 (8th Cir.1988) (“Without that essential proof [of every element of the offense of burglary], we must conclude that the jury exceeded the bounds of legitimate inference, and engaged in speculation in finding Ward guilty on that count.”).
 

 This conclusion is reinforced by the fact that the state supreme court based its conclusion, in part, on a flawed factual finding. In recounting the trial evidence, the supreme court stated that, the morning after Petitioner and T.D. went to the Macaroni Grill, T.D. remembered “waking up in bed with [him]” at the bed-and-breakfast and that this “surprise awakening ... in [Petitioner’s] bed in a state of relative undress” was consistent with non-consensual sexual activity. The trial transcript shows that T.D. never testified that Petitioner was
 
 in the bed with her,
 
 only that he was “there.” Her actual testimony on direct examination about that morning was as follows:
 

 Q. What is the next recollection that you do have?
 

 A. I woke up at the bed and breakfast, at the Burnett House.
 

 Q. At the Burnett House. Okay. About what time was that?
 

 A. I don’t know exactly what time it was.
 

 Q. When you left the Burnett House, was it daylight, dark?
 

 A. It — it was daylight.
 

 Q. In the morning?
 

 A. Yes, sir.
 

 Q. Describe what you felt when you woke up.
 

 A. I was still sick.
 

 Q. In what way?
 

 A. I had stomach cramps. I was sick at my stomach, felt nauseated.
 

 Q. Was the Defendant there?
 

 A. Yes, he was.
 

 Q. How were you dressed?
 

 A. In a long tee shirt.
 

 Q. And where were you at the Burnett House?
 

 A. I was in one of the bedrooms.
 

 Q. How was he dressed?
 

 A. He had tee shirt, a tee shirt and some kind of shorts, maybe running shorts, some — looked like a wind suit something maybe, but it was shorts, if I’m not mistaken. I do remember it was shorts.
 

 (Tr .2016-17.)
 

 On cross-examination, the testimony was as follows:
 

 Q. On the trip back after the Macaroni Grill, where did you wake up?
 

 A. In the Burnett House Bed and Breakfast.
 

 Q. On the couch?
 

 A. No, sir.
 

 Q. In the bed?
 

 A. Yes, sir.
 

 Q. How were you dressed?
 

 A. In a long tee shirt.
 

 Q. He was there? [referring to Petitioner]
 

 A. Yes, he was.
 

 (Tr.2059-60.)
 

 T.D.’s testimony that Petitioner was “there” could mean that he was in the bed, but it could also mean that he was simply in the bedroom or that he had just walked in from an adjacent room. Nothing directly supports a finding that he was
 
 *MCLXII
 
 physically in the bed with her. Petitioner does not, however, contest this specific finding and has presented no argument, much less any clear and convincing evidence, to rebut it as required by § 2254(e)(1). Nevertheless, the Court finds that the state supreme court’s partial reliance on this finding “further highlights the unreasonableness of the state court’s decision.”
 
 [11]
 

 See Wiggins,
 
 123 S.Ct. at 2539.
 

 As stated earlier, this Court also attaches importance to the fact that the jury viewed the prior sexual encounter on the videotape and determined that it was first-degree sexual abuse, rather than rape. The Court recognizes that the inconsistency between these verdicts does not, in and of itself, demonstrate a constitutional violation and that the jury would not necessarily be bound by its finding that the Monticello encounter amounted to the lesser offense of sexual abuse.
 
 See Dowling v. United States,
 
 493 U.S. 342, 353-54, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990) (“inconsistent verdicts are constitutionally tolerable”); Harr
 
 is v. Rivera,
 
 454 U.S. 339, 345, 102 S.Ct. 460, 70 L.Ed.2d 530 (1981);
 
 Dunn v. United States,
 
 284 U.S. 390, 394, 52 S.Ct. 189, 76 L.Ed. 356 (1932) (“That the verdict may have been the result of compromise, or of a mistake on the part of the jury is possible. But verdicts cannot be upset by speculation or inquiry into such matters.”). A criminal defendant is “afforded protection against jury irrationality or error by the independent review of the sufficiency of the evidence” as to a particular conviction.
 
 United States v. Rowell,
 
 469 U.S. 57, 67, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984). Nevertheless, the Court believes that the jury’s sexual abuse finding substantially undermines the reasonableness of any inference, drawn from the same conduct, that the same acts occurred again and amounted to rape. The state argued on direct appeal that the jury could have been confused as to which incident was on videotape.
 
 Sera,
 
 17 S.W.3d at 75. It may very well be that the jury intended to find Petitioner guilty of rape as to the videotaped encounter and guilty of sexual abuse as to the implied, non-videotaped incident. However, this Court is not in a position to rectify what may be perceived as a mistake on the part of the jury, and to do so would amount to pure speculation. This Court’s inquiry on habe-as review is limited to the sufficiency of the evidence as to the particular conviction being challenged.
 

 The conclusion that the trial evidence was insufficient to prove rape as to the Macaroni Grill count is further bolstered by two other similar incidents in the record, for which the prosecution did not even pursue a rape charge. First, there was another occasion between T.D. and Petitioner, during which they went to a casino in Greenville, Mississippi. She could not remember anything about the ride home and woke up the next morning on the couch at the Burnett House. (Tr.2009-13.) Similarly, J.H. testified about an evening she spent with Petitioner. Shortly after noticing a grainy film in her cup, she began to feel the effects of whatever was in her drink, and could not remember going home. Her next memory was waking up the following morning feeling sick. (Abst.53-54, 57-58.) Petitioner was charged with attempted rape for this incident. The jury was not asked to infer that sexual activity occurred during the blackout periods that these women experienced.
 
 *MCLXIII
 
 These two occasions, along with the Monticello incident which the jury found to involve sexual abuse, demonstrate the many possible inferences that can be drawn from strikingly similar circumstantial evidence. If the ultimate inference that rape occurred is truly reasonable as to one occasion, why not all?
 

 Finally, it is very significant that two of seven justices dissented from the Arkansas Supreme Court’s decision, disagreeing with the conclusion that the evidence was sufficient to prove the rape of T.D. in the Macaroni Grill count.
 
 [12]
 
 After recounting the evidence,
 
 [13]
 
 the dissent noted the state’s argument that substantial evidence of rape existed due to the “proof of other criminal wrongs such as the Rohypnol-indueed rapes of [T.D.] in the Monticello count and [J.H.] as well as [P.C.] in Missouri, which involved similar surrounding circumstances.” The dissent then stated:
 

 What is absent in the State’s case is any proof that the
 
 act
 
 of rape ever occurred. Rule 404(b) may provide for proof of
 
 intent
 
 based on other criminal wrongs but not proof of the act itself. In every criminal case, the State must prove
 
 corpus delicti,
 
 that is, that an unlawful injury occurred. 1 Charles E. Torcía, Wharton’s Criminal Law, § 28 (15th ed.1993);
 
 Johnson v. State,
 
 298 Ark. 617, 770 S.W.2d 128 (1989). The primary reason that the State must prove
 
 corpus delicti
 
 is to insure that a person is not convicted of a crime that was never committed.
 
 Hart v. State,
 
 301 Ark. 200, 783 S.W.2d 40 (990).
 

 We run a great risk when we presume criminal conduct and convict a person for a crime based on other similar crimes committed by that person, when there is no proof that the criminal act ever occurred. This court has made it clear that we do not presume criminal conduct; rather, that is a matter of proof for the State.
 
 Johnson v. State,
 
 198 Ark. 871, 131 S.W.2d 934 (1939);
 
 see also
 
 Ark.Code Ann. § 16-89-111(d) (1987) (confession must be supported by proof a crime was committed). The State’s burden was to prove the act of rape in connection with the Macaroni Grill count and this it failed to do. I would reverse the judgment of conviction for rape in the Macaroni Grill count.
 

 Sera,
 
 17 S.W.3d at 82-83 (parallel citations omitted). This Court agrees with the dissenting justices that the evidence at trial was simply insufficient to prove, beyond a reasonable doubt, that Petitioner raped T.D. on the night in question.
 

 Having determined that no rational jury could have convicted Petitioner of raping the victim in connection with the Macaroni Grill count, this Court respectfully finds that the Arkansas Supreme Court unreasonably applied the constitutional principles set forth in
 
 Jackson
 
 and
 
 Winship
 
 in finding the evidence sufficient on that count. [W]here a state conviction has been secured at the expense of a constitutional right, it is this court’s obligation, pursuant to section 2254, to provide habeas corpus relief.”
 
 Ward,
 
 841 F.2d at 846.
 

 Petitioner also argues that, in finding the evidence to be sufficient, the trial court and the Arkansas Supreme Court imper-missibly relied on Rule 404(b) evidence regarding prior conduct of Petitioner and ignored the judge’s limiting instructions in contravention of state and federal law. In support, Petitioner cites several Supreme Court cases for the “settled presumption
 
 *MCLXIV
 
 that juries follow their instructions,”
 
 [14]
 
 as well as
 
 Huddleston v. United States,
 
 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988), which emphasizes the necessity of a limiting instruction to protect against unfair prejudice from evidence admitted under Rule 404(b).
 

 While these arguments have some appeal, the only decision under review here is that of the Arkansas Supreme Court, and the only “other act” relied upon by that court was the Monticello incident between Petitioner and T.D., as portrayed in the videotape. The evidence surrounding that incident was the basis for three other counts against Petitioner which were tried at the same time as the Macaroni Grill count. No Rule 404(b) limiting instruction was given before T.D. testified about the Monticello episode or before the videotape was admitted.
 
 (See
 
 Abst. 149, 268; Tr.1986.) The Texas and Missouri offenses appear to have been the focus of the state court proceedings regarding the Rule 404(b) evidence, including the state court pleadings, the trial court’s hearing and order, and the supreme court’s opinion, as well as Petitioner’s arguments in that regard here.
 
 (See
 
 Abst. 7-14, 16-35; Resp’t Ex. B-3, D, E;
 
 Sera,
 
 17 S.W.3d at 76-77; docket entry # 1 ¶¶ 10, 15, 18.) The limiting instructions were given before the testimony of the Texas and Missouri victims only, and each instruction expressly referred to the jury’s consideration of the testimony of “this witness.” (Tr. 2108-09, 2198-99; Abst. 175, 193.)
 
 [15]
 
 From the record presented here, it is unclear whether the Monticello evidence was encompassed in the state courts’ Rule 404(b) proceedings or whether the jury was given any specific instructions which prohibited reliance upon that evidence in determining guilt on the Macaroni Grill count.
 
 [16]
 

 
 *MCLXV
 
 In any event, the Court has found that the Arkansas Supreme Court’s decision is an unreasonable application of the principles in
 
 Jackson
 
 and
 
 Winship
 
 and need not rely on the other arguments raised by Petitioner regarding the proper use of evidence admitted under Rule 404(b) and disregard of the presumption rules. The finding here is only that the evidence underlying the prior Monticello incident— whether designated as Rule 404(b) evidence or not — was insufficient to permit a reasonable inference that sexual intercourse or deviate sexual activity occurred again in connection with the Macaroni Grill count. Furthermore, even if the jury relied on the testimony of the Texas and Missouri victims in contravention of the trial court’s limiting instructions, the Arkansas Supreme Court clearly did not rely on that testimony in upholding the rape conviction, referring only to the Monticello evidence.
 

 Respondent presents three arguments for denying federal habeas relief. First, he contends that non-404(b) evidence shows that, based on the factual findings of the Arkansas Supreme Court, Petitioner “sexually assaulted [T.D.] in the context of the ‘Macaroni Grill incident’ using Rohyp-nol.” As explained above, there is circumstantial evidence that some degree of sexual
 
 contact
 
 occurred, which arguably would constitute a “sexual assault” as now defined in the Arkansas statutes.
 
 [17]
 
 Again, however, Petitioner was convicted of rape. While the prior Monticello incident may have been “non-404(b) evidence,” it was the only evidence relied upon by the Arkansas Supreme Court suggesting that Petitioner engaged in “sexual intercourse” or “deviate sexual activity” with T.D. so as to constitute rape. As explained above, that evidence is insufficient to permit the inference that Petitioner engaged in those same acts with T.D. on the Macaroni Grill occasion.
 

 Respondent also contends that it is permissible for Rule 404(b) evidence to establish that a rape occurred, citing
 
 United States v. LeCompte,
 
 99 F.3d 274 (8th Cir.1996). In
 
 LeCompte,
 
 the government argued that unrelated prior bad acts of a defendant may be admissible under Fed. R.Evid. 404(b) where those acts “establish a ‘signature’
 
 modus operandi,
 
 that is, ‘other crimes by the accused so nearly identical in method as to earmark them as the handiwork of the accused.’”
 
 Id.
 
 at 278. The Eighth Circuit accepted the theory that a “jury can rationally infer from evidence that the defendant committed a pri- or crime in an unusual and distinctive manner and [from] evidence that a second similar crime was committed in the same unusual and distinctive manner that the defendant committed the second crime.” The Eighth Circuit then stated that such evidence is normally offered to prove identity in cases “where it is clear that a crime has been committed and the issue is whether defendant committed it;” whereas, the issue in the present ease was “whether the alleged offense occurred.” The Eighth Circuit found that the theory encompassed both issues and assumed that “legitimate ‘signature’ evidence would be admissible for this purpose.”
 
 Id.
 

 However, in
 
 LeCompte
 
 and all of the cases cited therein, the “signature” evidence was not the only evidence that a
 
 *MCLXVI
 
 specific crime had even occurred. In
 
 Le-Compte,
 
 the victim testified that sexual contact occurred, and the Rule 404(b) evidence was offered as corroboration.
 
 Id.
 
 at 276. The same point distinguishes
 
 United States v. Woods, 484
 
 F.2d 127, 133 (4th Cir.1973), also cited by Respondent. In Woods, there was no question that a death occurred, and the issue was whether the death was a homicide, as well as who caused the death. Respondent has cited no cases, nor has the Court’s independent research revealed any cases, in which “other acts” evidence, whether admitted under Rule 404(b) or otherwise, was the
 
 only
 
 evidence that a specific injury or harm had even occurred. The Court is aware of no cases whatsoever holding that a defendant can be convicted of rape based solely on evidence that he previously engaged in acts with the same victim which could constitute the statutory elements of rape.
 

 Lastly, Respondent contends that all of the evidence supporting Petitioner’s rape conviction was admitted under Arkansas evidentiary law, which is not reviewable in a federal habeas proceeding.
 
 See Estelle v. McGuire,
 
 502 U.S. 62, 67-68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) (federal habeas court cannot reexamine a state court ruling as to whether evidence was properly admitted under state law). However, the question here is not whether the evidence was erroneously admitted, but whether, assuming it was properly admitted, the total evidence of record was sufficient to support the rape conviction.
 

 The Court recognizes that the current federal habeas statutes, as enacted in 1996, provide for a “highly deferential” standard for evaluating state court rulings.
 
 Woodford v. Visciotti
 
 537 U.S. 19, 24, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002);
 
 Lindh v. Murphy,
 
 521 U.S. 320, 333 n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). Nonetheless, this does not completely foreclose relief, and “deference does not imply abandonment or abdication of judicial review.”
 
 Miller-El,
 
 123 S.Ct. at 1041. At least two Courts of Appeal have disagreed with a state supreme court’s decision that the evidence was constitutionally sufficient, finding the state decision to be an unreasonable application of
 
 Jackson
 
 under § 2254(d).
 
 See Piaskowski,
 
 256 F.3d at 692-94 (Seventh Circuit case finding that trial evidence did not implicate the habeas petitioner to “a state of near certitude” as required by
 
 Jackson,
 
 that the state attempted to fill the “gaping hole” in the proof with “meager circumstantial evidence,” and that the “two-stage inference” necessary to sustain the murder conviction “requires a leap of logic that no reasonable jury should have been permitted to take”);
 
 Donahue v. Cain,
 
 231 F.3d 1000, 1004-05 (5th Cir.2000) (finding that trial evidence was insufficient “to lead a rational trier of fact to conclude beyond a reasonable doubt that [the petitioner] knew or reasonably should have known” that the man firing a pistol at him was a peace officer);
 
 see also Walters v. Maass,
 
 45 F.3d 1355, 1359-60 (9th Cir.1995) (under prior habeas law) (evidence that defendant attempted to lure 13-year-old girl into truck by fabricating story about a lost dog and that defendant had previously been convicted of kidnapping, rape and sodomy of a different girl and had used a similar story was insufficient on habeas review to sustain attempted rape and attempted sodomy convictions; only evidence of intent to rape and sodomize was prior conviction).
 

 The Court’s holding today is that, where the only evidence of sexual intercourse or deviate sexual activity was the videotape of a prior encounter between Petitioner and the victim which the jury had found to establish sexual abuse, the evidence was constitutionally insufficient to find that the act of sexual intercourse or deviate sexual activity occurred again on the night that Petitioner and the victim went to the Mac
 
 *MCLXVII
 
 aroni Grill. No rational fact-finder could reasonably infer the necessary elements of rape beyond a reasonable doubt under these circumstances. The Arkansas Supreme Court’s finding that the evidence was sufficient thus constitutes an objectively unreasonable application, under § 2254(d)(1), of the principles set forth by the United States Supreme Court in
 
 Jackson
 
 and
 
 Winship.
 

 VII.
 

 Appropriate Relief
 

 When a defendant’s conviction is reversed by an appellate court on the sole ground that the evidence was insufficient to sustain the jury’s verdict, the Double Jeopardy Clause bars a retrial on the same charge.
 
 Burks v. United States,
 
 437 U.S. 1, 18, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978). Therefore, where a federal habeas court finds that the state has failed to meet its burden of proof, the appropriate remedy is to issue a writ of habeas corpus outright, rather than conditioning grant of the writ on the state’s failure to retry the petitioner.
 
 Piaskowki,
 
 256 F.3d at 694-95;
 
 Donahue,
 
 231 F.3d at 1005;
 
 see also Ward,
 
 841 F.2d at 849 (granting the writ due to insufficient evidence and setting aside conviction).
 

 VIII.
 

 Conclusion
 

 For the foregoing reasons, the Court finds merit in Petitioner’s argument that the evidence at trial was constitutionally insufficient to support his conviction for raping T.D. in connection with the Macaroni Grill incident, as charged in Count 5 of the felony information against him in state court. His petition for writ of habeas corpus is, therefore, granted, and this rape conviction is hereby set aside. This, of course, does not affect Petitioner’s remaining convictions or the sentences on those convictions.
 

 [1]
 

 . The parties have consented to the jurisdiction of the undersigned Magistrate Judge (docket entry # 10).
 

 [2]
 

 . Concurrent terms of 96 months of imprisonment for each conviction for introduction of a controlled substance, 120 months for each kidnapping conviction, 72 months for the sexual abuse conviction, 360 months for the rape conviction, and 180 months for the attempted rape conviction.
 

 [3]
 

 .Respondent's exhibits, unless otherwise indicated, are attached to docket entry # 5.
 

 [4]
 

 . All abstract references are to Resp't Ex. B-l & B-2; abstract pages that were missing from the original exhibit are attached to docket entries # 14 & # 15. All transcript references are to the partial record, submitted as Resp't Ex. 2 to docket entry # 14.
 

 [5]
 

 . The trial record, as presented to the Arkansas Supreme Court, contained nearly 3, 100 pages of pleadings, testimony and exhibits.
 
 Sera,
 
 17 S.W.3d at 64.
 

 [6]
 

 . Ark. R. Evid. 404(b) provides as follows:
 

 Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a
 
 *MCLIII
 
 person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.
 

 [7]
 

 . The statute, as in effect at the time of the offense, reads in relevant part as follows:
 

 (a) A person commits rape if he engages in sexual intercourse or deviate sexual activity with another person:
 

 (1) By forcible compulsion; or
 

 (2) Who is incapable of consent because he is physically helpless; or
 

 (3) Who is less than fourteen (14) years of age....; or
 

 (4) Not his spouse who is less than sixteen (16) years of age and who is incapable of consent because he is mentally defective or mentally incapacitated.
 

 (b) Rape is a Class Y felony.
 

 [8]
 

 . At the time of the offenses at issue here, the statutes defined "physically helpless” as meaning a person is unconscious or physically unable to communicate lack of consent. Ark.Code Ann. § 5-14-101(5) (1995). The Arkansas Supreme Court referred to all of the women in the videotape as being "indisputably unconscious.”
 
 Sera,
 
 17 S.W.3d at 80. Petitioner does not dispute this finding, and it is supported by the testimony of the two experts who viewed the video. Dr. Tolliver testified that the women were "at points ... definitely unconscious,” "appeared to be unconscious for the most part,” and at times were moving "from a totally unconscious state to a semi-conscious state.” (Abst.254-56.) Dr. ElSohly testified that "all three women” on the tape appeared to be in a "basically vegetative condition," as if "under anesthesia,” and in "total collapse.” (Abst.78-79.) The factual findings in this regard are, therefore, presumed correct. 28 U.S.C. § 2254(e)(1).
 

 [9]
 

 . The sexual abuse statutes have been repealed and replaced with new statutes governing varying degrees of “sexual assault.”
 
 See
 
 Ark.Code Ann. §§ 5-14-124 to -127 (2003 Supp.) The applicable language of the rape statute and definitions is unchanged.
 

 [10]
 

 . "[Sjexual abuse in the first degree is proven by a finding of the same or less than all of the elements of rape.... Both sexual intercourse and deviate sexual activity [the sexual acts required for rape] necessarily involve the touching of sexual organs and/or the anus of another [the sexual acts required for first-degree sexual abuse].”
 
 Speer v. State,
 
 18 Ark. App. 1, 708 S.W.2d 94, 98 (1986).
 

 [11]
 

 . In view of this Court's conclusion that the state supreme court’s decision constitutes an unreasonable application of federal law under § 2254(d)(1), it is unnecessary to also con-elude that this factual finding constitutes an “unreasonable determination of the facts in light of the evidence presented in the State court proceeding" under § 2254(d)(2).
 

 [12]
 

 . The same two justices also would have granted Petitioner’s petition for rehearing. (Resp't Ex. E.)
 

 [13]
 

 . It should be noted that the dissent correctly characterizes the evidence in stating that the victim "woke up at the bed-and-breakfast,” rather than that she woke up "in bed with” Petitioner.
 
 Sera,
 
 17 S.W.3d at 82.
 

 [14]
 

 .
 
 Weeks v. Angelone,
 
 528 U.S. 225, 234, 120 S.Ct. 727, 145 L.Ed.2d 727 (2000);
 
 Shannon v. United States,
 
 512 U.S. 573, 585, 114 S.Ct. 2419, 129 L.Ed.2d 459 (1994);
 
 Zafiro
 
 v.
 
 United States,
 
 506 U.S. 534, 540,
 
 113 S.Ct. 933, 122
 
 L.Ed.2d 317 (1993);
 
 Richardson v. Marsh,
 
 481 U.S. 200, 211, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987).
 

 [15]
 

 . The following instruction was given immediately preceding the testimony of the Missouri victim:
 

 Regarding the testimony of this witness, ladies and gentlemen of the jury, you’re instructed that evidence of other alleged crimes, wrongs or acts of Steven Anthony Sera may not be considered by you to prove the character of Steven Anthony Sera in order to show that he acted in conformity with that character.
 

 This evidence is not to be considered to establish a particular trait of character that he may have, nor is it to be considered to show that he acted similarly or accordingly on the day of the incident. This evidence is merely offered as evidence of the plan, intent, knowledge or lack of accident or mistake, or consent or lack (hereof as to the alleged victims in this case.
 

 You may not convict a person simply because you believe he may have committed similar acts in the past. Mr. Sera is on trial only for the crimes charged and you may consider the evidence of prior acts only on these issues. Whether any other alleged crimes, wrongs, or acts have been committed is for you to determine.
 

 (Tr. 2108-09) (emphasis added). The instruction was also read before the Texas victim testified, with the court specifically stating that it was “regarding [M.H.j’s testimony.” (Tr.
 
 2198-99.)
 

 [16]
 

 .The limiting instructions, as set forth in the preceding footnote, did contain general language admonishing the jurors that they “may not convict a person simply because [they] believe he may have committed similar acts in the past” and that Petitioner was “on trial only for the crimes charged and [that they] may consider the evidence of prior acts only on these issues [the issues listed].” As explained above, the only evidence relied upon by the Arkansas Supreme Court which shows the statutorily required element of "sexual intercourse or deviate sexual activity” was the videotaped conduct showing those acts on a prior occasion, precisely the basis prohibited by the instruction. While this language certainly lends weight to Petitioner's arguments, the Court need not determine whether the
 
 *MCLXV
 
 Arkansas Supreme Court’s decision contravenes United States Supreme Court law regarding Rule 404(b) limiting instructions and the presumption that juries follow the instructions given.
 

 [17]
 

 .
 
 See
 
 Ark.Code Ann. § 5-14-125(a)(2) (a person commits second-degree sexual assault if he "engages in sexual contact with another person who is incapable of consent because the person is physically helpless, mentally defective, or mentally incapacitated”).